[No. B182156. Second Dist., Div. Four. Mar. 18, 2008.]

BENJAMIN J. FOGEL et al., Plaintiffs and Appellants, v.
FARMERS GROUP, INC., et al., Defendants and Appellants.

**COUNSEL**

Engstrom, Lipscomb & Lack, Walter J. Lack, Daniel G. Whalen; Girardi & Keese, Thomas V. Girardi, Graham LippSmith; Law Offices of Joe K. Longley, Joe K. Longley; The Gallagher Law Firm, Michael Gallagher; Burrow & Parrott, David Burrow; Law Offices of Philip K. Maxwell and Philip K. Maxwell for Plaintiffs and Appellants.

Harvey Rosenfield and Pamela M. Pressley for the Foundation for Taxpayer and Consumer Rights as Amicus Curiae on behalf of Plaintiffs and Appellants.

Skadden, Arps, Slate, Meagher & Flom, Joren S. Bass, Richard J. Zuromski, Jr., and Raoul D. Kennedy for Defendants and Appellants.

## OPINION

**WILLHITE, Acting P. J.**—The issue presented in this appeal is whether the attorneys-in-fact for subscribers of reciprocal insurance exchanges may be sued by the subscribers to recover alleged excessive fees the attorneys-in-fact collected in breach of their fiduciary duty to the subscribers. The fees were collected from premiums the subscribers paid to the exchanges. The premiums were based upon rates approved by the Commissioner of the Department of Insurance (the Commissioner). The attorneys-in-fact contend the attorney-in-fact fees (the AIF fees) are a component of that approved rate and, therefore, the subscribers' lawsuit is barred under *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750 [92 Cal.Rptr.2d 132] (*Walker*)—which held that Insurance Code[1] section 1860.1 precludes claims challenging an approved rate—and the filed rate doctrine, because the lawsuit improperly seeks to recoup premiums charged in accordance with an approved rate. We hold that neither *Walker*, nor section 1860.1, nor the filed rate doctrine applies to this lawsuit against the attorneys-in-fact, because the attorneys-in-fact are entities distinct from the exchanges, with fiduciary relationships with each of the subscribers. Accordingly, we reverse the summary judgment in favor of the attorneys-in-fact and direct the trial court to enter an order denying defendants' motion and granting plaintiff's motion to summarily adjudicate defendants' exhaustion of administrative remedies affirmative defense.

## BACKGROUND

Before discussing the allegations of the complaint and the procedural aspects of this case, we must first provide some background on reciprocal insurance exchanges and insurance rate regulation.

### A. *Reciprocal Insurance Exchanges*

■ A reciprocal insurance exchange (also called an interinsurance exchange) " 'is an unincorporated business organization of a special character in

---

[1] Further undesignated statutory references are to the Insurance Code.

which the participants, called subscribers . . . are both insurers and insureds; for their mutual protection, they exchange insurance contracts through the medium of an attorney-in-fact.' " (*Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 652 [155 Cal.Rptr. 843], quoting *Industrial Indem. Co. v. Golden State Co.* (1953) 117 Cal.App.2d 519, 522 [256 P.2d 677]; see also §§ 1300, 1301, 1305.) By statute, the reciprocal insurance exchange is deemed the insurer and each subscriber is deemed an insured. (§ 1303.)

The interinsurance exchange is managed by the attorney-in-fact, which may be a corporation, and which is appointed by the subscribers through powers of attorney. (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 704 [57 Cal.Rptr.2d 798]; see also § 1305.) For its services, the attorney-in-fact typically receives a percentage of the premiums the subscribers pay to the interinsurance exchange. (*Delos v. Farmers Group, Inc., supra,* 93 Cal.App.3d at p. 652; *Industrial Indem. Co. v. Golden State Co., supra,* 117 Cal.App.2d at p. 523.) The attorney-in-fact's relationship with each subscriber is that of a fiduciary.[2] (*Tran v. Farmers Group, Inc., supra,* 104 Cal.App.4th at p. 1213.)

B. *Insurance Rate Regulation in California*

Before 1988, insurance regulation in California operated under the "open competition" system, "under which 'rates [were] set by insurers without prior or subsequent approval by the Insurance Commissioner.' " (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 240 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century*).) That changed after the General Election in November 1988, when the voters of California approved an initiative that was designated Proposition 103. Proposition 103 required insurers to reduce their rates immediately, and instituted a "prior approval" system, which requires insurers to submit a rate application to the Commissioner for approval before changing any rates. (*20th Century,* at pp. 242–243; §§ 1861.01, 1861.05, subd. (b).) Under the new system, insurers may charge only approved rates (§ 1861.01, subd. (c)), although they are permitted to return savings or unabsorbed premiums to policyholders (§ 1860; see also § 1402; *Lee v. Interinsurance Exchange, supra,* 50 Cal.App.4th at p. 705 [directors of interinsurance exchanges "may, but are not required to, return savings or credits to the subscribers"]; *Delos v. Farmers Group, Inc., supra,* 93 Cal.App.3d at p. 652 [" 'If the amount of premiums deposited is not fully required for the purposes

---

[2] We note there may be limits on the scope of the attorney-in-fact's fiduciary duty (see, e.g., *Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1215 [128 Cal.Rptr.2d 728]), but that issue was not raised below, and we will not address it in this appeal.

mentioned [i.e., to pay losses and costs, and to maintain reserves and surpluses], the excess, called savings, is returned in whole or in part as dividends' "]).

Among other things, Proposition 103 enacted a statutory scheme governing the rate approval process, which provides for hearings before an administrative law judge in certain circumstances and allows for consumer participation.[3] (See, e.g., §§ 1861.05–1861.10.) The key provision is found in subdivision (a) of section 1861.05. That provision states that rates cannot be approved or remain in effect if they are "excessive, inadequate, unfairly discriminatory or otherwise in violation of" chapter 9 of division 1, part 2 of the Insurance Code, governing rates and rating organizations (hereafter Chapter 9). (§ 1861.05, subd. (a).)

To implement the rate-setting component of Proposition 103, the Commissioner adopted regulations establishing the process and policies to be employed to determine whether rates are excessive or inadequate. (Cal. Code Regs., tit. 10, § 2641.1 et seq.) "The rate regulations define as 'excessive' a rate that is 'expected to yield the reasonably efficient insurer a profit that exceeds a fair return on the investment used to provide the insurance' in light of the 'competing interests of consumers in lower prices and of investors in prices that yield high returns' and the 'fact that insurance is imbued with the public interest and is sometimes legally required.' (Cal. Code Regs., tit. 10, § 2642.1.) They define as 'inadequate' a rate 'under which a reasonably efficient insurer is not expected to have the opportunity to earn a fair return on the investment that is used to provide the insurance' in light of the considerations identified above. (*Id.*, tit. 10, § 2642.3.) Lastly, they define a 'fair return' as the 'profit that an investor can reasonably expect to earn from an investment in a business other than insurance subject to regulation [thereunder] presenting investment risks comparable to the risks presented by insurance subject' thereto. (*Id.*, tit. 10, § 2642.2.)" (*20th Century, supra*, 8 Cal.4th at p. 253.)

The regulations also include "ratemaking formulas," which calculate the maximum and minimum permitted earned premiums for each line of insurance offered by the insurer. (Cal. Code Regs., tit. 10, §§ 2644.2, 2644.3; *20th Century, supra*, 8 Cal.4th at p. 250.) The formulas take into account the

---

[3] Section 1861.055, which was enacted two years after Proposition 103, requires the Commissioner to adopt regulations governing hearings on rate change applications. Those regulations are found in title 10 of the California Code of Regulations, beginning at section 2648.1.

insurer's losses, expenses, ancillary and investment income, as well as certain factors (such as a profit factor) that incorporate generic determinations made by the Commissioner that apply to all insurers. (Cal. Code Regs., tit. 10, §§ 2644.2–2644.24; *20th Century, supra*, 8 Cal.4th at pp. 250–252.)[4] The formula "is designed to yield a premium that the insurer should receive from its insureds in order to earn a sum amounting to (1) the reasonable cost of providing insurance and (2) the capital used and useful for providing insurance multiplied by a fair rate of return." (*20th Century, supra*, 8 Cal.4th at p. 251.)

Under the "prior approval" system now in operation, the insurer is free to choose any rate that is neither "excessive" nor "inadequate" and submit an application for approval. (*20th Century, supra*, 8 Cal.4th at p. 252.) Based upon the information provided by the insurer, the Commissioner applies the ratemaking formulas to determine the maximum and minimum permitted earned premium, and must approve the rate if it falls between them. (*Id.* at p. 254; see also *id.* at pp. 284–285.) Any person may request a hearing before an administrative law judge on a rate change application or an approved rate alleged to be excessive or inadequate or otherwise in violation of Chapter 9. (§ 1861.10; see also Cal. Code Regs., tit. 10, § 2646.4.) The hearing has two purposes: "One is to determine whether the insurer has properly applied the relevant statutory and regulatory provisions, including generic determinations, in calculating the maximum or minimum permitted earned premium. (Cal. Code Regs., tit. 10, § 2646.4, subd. (b)(1).) [¶] The other is to determine whether the resulting maximum or minimum permitted earned premium should be adjusted. (Cal. Code Regs., tit. 10, § 2646.4, subd. (b)(2).)" (*20th Century, supra*, 8 Cal.4th at p. 255.) Following the hearing, the Commissioner may adopt, amend, or reject the decision of the administrative law judge. (§ 1861.08.) The Commissioner's decision is subject to judicial review under an independent judgment standard of review. (§§ 1861.09, 1858.6.)

As part of the change in the insurance rate regulation system, Proposition 103 added two statutes to Chapter 9 regarding the applicability of other laws to the business of insurance and consumer participation in the ratemaking process. Section 1861.03 provides in part that "[t]he business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust and unfair business practices

---

[4] The ratemaking formula and its components are discussed in detail in *20th Century*. (See *20th Century, supra*, 8 Cal.4th at pp. 250–251.) Although the regulations defining the formula and its components were amended in 2007, the present formula and its components are similar to those discussed in that case.

laws (Parts 2 (commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7 of the Business and Professions Code)." (§ 1861.03, subd. (a).) Section 1861.10 provides in part that "[a]ny person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article."[5] (§ 1861.10, subd. (a).)

But even though Proposition 103 repealed several sections of Chapter 9 that were inconsistent with the new statutory scheme, it left intact a provision of the former law—section 1860.1—that is at issue in this case. Section 1860.1 provides: "No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." This statute was enacted as part of the McBride-Grunsky Insurance Regulatory Act of 1947, to exempt insurers from federal regulatory legislation, including antitrust laws, and to authorize cooperation between insurers in ratemaking and other related matters. (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 979 [11 Cal.Rptr.3d 45].)

With this background in mind, we turn to the facts of this case.

C. *Factual and Procedural Background of This Case*

Plaintiff and appellant Benjamin J. Fogel holds automobile, homeowners, and umbrella insurance policies issued through Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange (collectively the Exchanges). The Exchanges are reciprocal insurance exchanges.

In August 2003, Fogel, on behalf of all policyholders of the Exchanges, filed a class action lawsuit against Farmers Group, Inc. (FGI) (which Fogel alleged was the attorney-in-fact for the policyholders of all three Exchanges), and the Exchanges. The original complaint alleged that the Exchanges required all policyholders to appoint FGI as their attorney-in-fact and that FGI breached its fiduciary duty to the policyholders and committed fraud by, among other things, charging excessive AIF fees. The original complaint also alleged that FGI and the Exchanges engaged in unlawful and/or unfair

---

[5] The article referred to in section 1861.10 is article 10 of Chapter 9, governing reduction and control of insurance rates. It includes the statutes governing the rate approval process discussed above.

business practices within the meaning of Business and Professions Code section 17200 et seq., based upon two practices—the Exchanges' requiring policyholders to appoint FGI as their attorney-in-fact and FGI's charging excessive AIF fees—as well as other conduct.

The first status conference was held in March 2004. At that status conference, the parties agreed that defendants would file a motion for summary judgment and/or summary adjudication by June 16, 2004, and that discovery would be stayed in the interim. The trial court calendared August 30, 2004, to hear defendants' motion, to give Fogel an opportunity to review the motion to determine what, if any, discovery he might need for his opposition.

Defendants filed their motion on June 16, 2004. In it, defendants emphasized that FGI, doing business as Farmers Underwriters Association, was attorney-in-fact only for Farmers Insurance Exchange policyholders, and that Truck Underwriters Association and Fire Underwriters Association serve as attorneys-in-fact for policyholders in Truck Insurance Exchange and Fire Insurance Exchange, respectively. One of the other arguments they made in the motion was based upon the form "Subscription Agreement" that defendants asserted each of the policyholders signed when they applied for insurance. Defendants submitted with its motion copies of the form subscription agreement used by each of the Exchanges. Each agreement provided that the relevant entity was appointed as the policyholder's attorney-in-fact, described the scope of its power to act on behalf of the subscriber, and stated that the subscriber agreed that the entity would collect a certain percentage of the premium as compensation for acting as attorney-in-fact.[6] Defendants argued that FGI did not breach its fiduciary duty because it was undisputed that it collected less than 20 percent of the premiums as AIF fees during the period at issue.

Upon receiving defendants' motion, Fogel's attorneys sought to obtain copies of any subscription agreements purportedly signed by Fogel. Fogel apparently did not recall signing any such agreement, and defendants did not produce any in response to Fogel's informal request. In light of the apparent absence of signed subscription agreements, Fogel sought leave to amend the complaint to add allegations regarding the agreements. He also sought to join

---

[6] The subscription agreements for each Exchange are virtually identical, except the agreement for Fire Insurance Exchange provides that Fire Underwriters Association would collect 25 percent of the premium as AIF fees, while the agreements for the other two attorneys-in-fact provide that those entities would collect 20 percent of the premium.

Fire Underwriters Association and Truck Underwriters Association as defendants to ensure that all of the proper parties would be included. Finally, he asked to dismiss the Exchanges and withdraw the fraud claim in order to "streamline the case . . . [to] permit the parties and court to focus on the central issues" before the court. The trial court granted Fogel's request to amend the complaint, over defendants' objection.

The first amended complaint, which is the complaint at issue in this appeal, alleges that although all three attorneys-in-fact have a form subscription agreement containing a power of attorney, defendants do not actually require the policyholder to sign the agreement. The amended complaint also alleges that FGI, which includes its subsidiaries Fire Underwriters Association and Truck Underwriters Association, as well as FGI doing business as Farmers Underwriters Association, earned billions of dollars in AIF fees in 2000, 2001, and 2002, resulting in profit margins of between 44.3 percent and 53.5 percent (and a profit margin of 55.6 percent for the first nine months of 2003).

The amended complaint asserts two causes of action on behalf of all policyholders in the Exchanges. First, it alleges that each of the attorneys-in-fact breached its fiduciary duty owed to the policyholders by collecting excessive AIF fees. Second, it alleges that the attorneys-in-fact's practices of collecting AIF fees without a signed power of attorney and collecting excessive fees are unlawful and/or unfair within the meaning of Business and Professions Code section 17200 et seq. The amended complaint seeks disgorgement, fee forfeiture, and/or restitution, as well as declaratory and injunctive relief.

A week after defendants filed their answer to the amended complaint, Fogel moved for summary adjudication of four issues: (1) that he was entitled to recover the AIF fees defendants collected because he had not signed a power of attorney appointing them his attorneys-in-fact; (2) that his claims were not barred by various sections of the Insurance Code and the California Code of Regulations, or by the "approved rate" rule; (3) that his claims were not barred by the exhaustion of administrative remedies rule; and (4) that his claims should not be abated or dismissed under the primary jurisdiction rule. The latter three issues were raised by defendants as affirmative defenses. The evidence in support of Fogel's motion included his declaration, in which he stated that he did not sign a subscription agreement or power of attorney in connection with the insurance policies he holds from the Exchanges and he

did not authorize defendants to collect any fee in connection with those policies.

In opposition to Fogel's motion, defendants presented several documents that purport to have Fogel's signature on them, including two applications for insurance. One of those applications appears to be a 1987 application for homeowners insurance, marked "CLOSED," that seems to include a subscription agreement (the document in the record is for the most part illegible), and the other is an application for personal umbrella liability insurance with Truck Insurance Exchange, dated 1992, with a signed subscription agreement. Defendants also submitted declarations from two agents for the Exchanges, who were Fogel's insurance agents from 1985 to 1995 and from 1999 to the present. Each agent stated that it was his practice to ask the insured to sign all required documents related to insurance policies issued by the Exchanges, including the subscription agreements.[7]

Defendants also filed their own motion for summary judgment or summary adjudication. Their primary arguments were that (1) California law does not permit recovery of premiums based upon approved rates; and (2) the lack of a signed subscription agreement does not entitle Fogel to a refund of the AIF fees defendants collected because the agreement was incorporated into his policies, or because he waived and/or is estopped to avoid the terms of the agreement.[8] In addition, defendants presented 38 issues for summary adjudication, in which they sought to separately adjudicate the claims against each defendant and to adjudicate the claims of each subset of putative class

---

[7] In addition to this evidence, defendants asked the trial court to take judicial notice of Fogel's declaration filed in support of his motion for summary adjudication as well as several declarations they earlier filed in support of their own motion for summary judgment. Defendants' request for *judicial notice* of their earlier filed declarations is puzzling, because they rely upon statements made in those declarations to support their factual assertions in opposition to Fogel's motion, but the court could not take judicial notice of those factual allegations. (See, e.g., *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 [110 Cal.Rptr.2d 877] [although a court may take judicial notice of the *existence* of documents in court files, it "may not take judicial notice of allegations in affidavits, declarations and probation reports in court records because such matters are reasonably subject to dispute and therefore require formal proof"].) The issue is immaterial, however, because the court properly may consider the declarations in connection with the identical issues raised in defendants' summary judgment motion.

[8] Defendants' moving papers did not directly address Fogel's allegation that, even if policyholders signed subscription agreements, the AIF fees were excessive and collected in breach of defendants' fiduciary duty despite the fact that the amount collected was less than that authorized by the subscription agreements. Instead, defendants merely argued that they did not bear the burden of disproving Fogel's allegations, and that the attorney-in-fact of an interinsurance exchange may be a for-profit entity. We express no opinion regarding the validity of Fogel's allegation.

members (e.g., policyholders who signed a subscription agreement, policy-holders who did not sign one, claims against one of the Exchanges by members who did not hold policies in that Exchange, etc.).

The trial court granted defendants' motion for summary judgment and denied Fogel's motion for summary adjudication. The court found that Fogel's lawsuit challenges an approved rate and seeks a partial refund of premiums, and therefore is precluded under *Walker, supra,* 77 Cal.App.4th 750. In addition, the court found there was a triable issue of fact regarding whether Fogel signed any subscription agreements. The court concluded that the issue was moot in light of *Walker,* but in any event, the issue was irrelevant because the subscription agreements were incorporated by refer-ence into his policies. The court entered judgment against Fogel.

Fogel appeals from the judgment, challenging both the grant of summary judgment and the denial of his motion for summary adjudication as to two issues (regarding whether he signed subscription agreements and whether exhaustion of administrative remedies applies). Defendants cross-appeal, challenging the trial court's ruling allowing Fogel to file an amended complaint.

## DISCUSSION

### A. *Fogel's Appeal from the Summary Judgment*

 As noted, defendants' motion for summary judgment raised two issues of law based upon undisputed facts: (1) whether Fogel's claims are barred by *Walker,* section 1860.1, and/or the filed rate doctrine; and (2) assuming Fogel did not sign a subscription agreement, whether his claim that he did not authorize defendants to collect AIF fees is barred by waiver, estoppel, or incorporation by reference rules. The trial court ruled in favor of defendants on both issues, which are subject to independent review on appeal. (*City of Malibu v. Santa Monica Mountains Conservancy* (2002) 98 Cal.App.4th 1379, 1383 [119 Cal.Rptr.2d 777].) We hold that Fogel's claims are not barred and reverse the summary judgment. By its plain language, section 1860.1 does not apply here because Chapter 9 does not authorize the collection of AIF fees, and a key distinction between our state's "prior approval" system and the federal filed rate system precludes application of the filed rate doctrine. In addition, although the language of the policies is insufficient to find the subscription agreements were incorporated by refer-ence, it is sufficient to find that Fogel waived or is estopped to argue that defendants are not entitled to some amount of AIF fees.

### 1. Walker *and Section 1860.1*

In *Walker*, the plaintiffs filed a lawsuit against more than 70 insurers and the Insurance Commissioner, "seeking damages or disgorgement of allegedly excessive premiums that the insurers [had been] authorized to collect." (*Walker, supra*, 77 Cal.App.4th at p. 752.) The plaintiffs alleged the Commissioner failed to make the generic determinations and adopt the factors needed to apply the ratemaking formulas to determine whether rates were within the range allowed by section 1861.05, subdivision (a). (77 Cal.App.4th at p. 753.) They supported their claims that the rates were excessive with allegations regarding industry trends and rates of return, and sought the redetermination of all rates in effect since September 1994, and a refund of the premiums collected in excess of the redetermined maximum permitted earned premium. (*Ibid.*)

The Court of Appeal held that section 1860.1 barred the plaintiffs' claims, stating: "If section 1860.1 has any meaning whatsoever . . . , the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner . . . ." (*Walker, supra*, 77 Cal.App.4th at p. 756.) It pointed to the language of the statute, which states that an " 'action taken . . . pursuant to the authority conferred by [Chapter 9]' " (*id.* at p. 756) cannot constitute grounds for civil proceedings, and reasoned that "[w]hatever else [Chapter 9] does, it definitely confers authority upon the commissioner to approve rates. Moreover, an insurer's action of collecting premiums consistent with an approved rate is certainly done pursuant to the authority conferred on the commissioner by [Chapter 9]." (*Id.* at pp. 756–757.) Thus, the court concluded that the plaintiffs' civil action challenging the approved rates was barred by section 1860.1.

Fogel and amicus curiae contend that *Walker* misconstrued section 1860.1, arguing that the statute does not apply to cases involving the conduct of a single actor. Their argument is based upon the origin of section 1860.1—which was enacted to prevent the application of antitrust laws to concerted action among insurers that was deemed necessary for making insurance rates—and the Supreme Court's opinion in *State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930 [103 Cal.Rptr.2d 662, 16 P.3d 85], in which the court interpreted a statute that applied to workers' compensation insurance and was virtually identical to section 1860.1. After examining the history of the enactment of both statutes, the Supreme Court held that the workers' compensation insurance statute immunizes insurers only from antitrust or other claims related to cooperation between insurers, rating organizations, and advisory organizations in the context of ratemaking. (*State Comp. Ins. Fund*, at

p. 936.) Fogel and amicus curiae argue this same reasoning applies to section 1860.1. We note, however, that the Supreme Court did not disapprove *Walker.* Rather, the court distinguished it, explaining that the plaintiffs in *Walker* "were attempting to challenge . . . the method by which the rates were set." (*State Comp. Ins. Fund*, at p. 942.)

██ We need not resolve whether section 1860.1 applies to immunize only concerted action, because we find that Fogel's claims are not within the scope of section 1860.1 immunity under the plain language of the statute. Fogel alleges that defendants breached their fiduciary duty as attorneys-in-fact and committed unfair business practices by collecting excessive AIF fees and/or collecting AIF fees without a signed subscription agreement. Section 1860.1 states that only those civil proceedings based upon an "act done, action taken or agreement made pursuant to the authority conferred by [Chapter 9]" are precluded. Thus, Fogel's claims will be precluded only if defendants' collection of AIF fees is an act done or action taken under the authority conferred by Chapter 9.

Defendants do not identify any specific provision of Chapter 9 that authorizes them to collect AIF fees. In fact, Chapter 9 does not refer to attorneys-in-fact at all. Instead, defendants argue that their collection of AIF fees is authorized by Chapter 9 because those fees "came out of the insurance premiums that Fogel and other insureds paid to the Exchanges" and are listed as expenses in documents the Exchanges submitted to the Commissioner as part of their rate change applications, which were approved.

Defendants' reasoning is flawed. The mechanism by which defendants collect the AIF fees—collecting a percentage of the premiums paid to the Exchanges—is not dispositive. Defendants' right to collect fees from premiums does not arise from any authority granted under Chapter 9. It arises from their agreements with each subscriber to act as the subscriber's attorney-in-fact.[9] The terms of those agreements are not regulated by Chapter 9; indeed, there is no requirement that the terms even be disclosed during the rate approval process. No doubt, the collection of premiums by the *Exchanges* based upon approved rates is an act authorized by Chapter 9. But the fact that the agreements between defendants and the subscribers allow defendants to pay themselves AIF fees from those premiums does not render defendants' collection of AIF fees an act authorized by Chapter 9.

Nor does the fact that the approved rate change applications disclosed expenses that included the amounts collected as AIF fees render defendants'

---

[9] As we discuss in section A.3., *post*, the agreement may be express (i.e., the subscription agreement) or implied.

collection of those fees an act authorized by Chapter 9. As a preliminary matter, we note that defendants are incorrect when they repeatedly state—including at oral argument—that the documents submitted in support of the Exchanges' rate change applications "listed" the amounts the attorneys-in-fact collected in AIF fees. In fact, the AIF fees are not "listed" anywhere in the voluminous documents submitted to the Commissioner for approval. Those documents simply list total expense amounts under the designations "Other Acquisitions, Field Supervision, and Collection Expenses Incurred" and "General Expenses Incurred" for the various lines of insurance. Apparently the amount of AIF fees is included in the total expense amounts listed, but in no way is it identifiable as a separate expense item relating to AIF fees, management fees, or any other similar designation. Nor is there any evidence that the Commissioner would interpret the expense listings as designating AIF fees. Moreover, even if the documents clearly listed the AIF fees as such, the Commissioner's approval of the rate change applications does not authorize defendants to collect the AIF fees.

■ As noted, under the Chapter 9 rate approval process, the Commissioner determines whether a proposed rate is "excessive" by determining whether the rate is "expected to yield the *reasonably efficient insurer* a profit that exceeds a fair return on the investment used to provide the insurance." (Cal. Code Regs., tit. 10, § 2642.1, italics added.) In other words, the purpose of the approval process is to examine and regulate the *insurer's* expected profit to ensure a fair, rather than excessive, rate of return. Nothing in Chapter 9 directs or authorizes the Commissioner to examine or regulate an *attorney-in-fact's* expected profit or rate of return.[10] Defendants' argument for immunity fails because they treat the insurer and the attorney-in-fact as a single entity that is regulated by the Commissioner, rather than separate and distinct entities, only one of which is regulated. While it might make sense to preclude lawsuits by policyholders challenging an *insurer's* rate of return as excessive, because that is something regulated by the Commissioner, it makes little sense to immunize the *unregulated* attorney-in-fact from a lawsuit by subscribers—the attorney-in-fact's principals—challenging a purportedly excessive rate of return.

---

[10] We acknowledge that Chapter 9 does place some limits on the amount of AIF fees the attorneys-in-fact may collect, albeit indirectly. As part of the rate approval process, the Commissioner calculates an industry wide "efficiency standard" for each line of insurance. That standard provides the "maximum allowable ratio of historic underwriting expenses . . . to historic earned premiums." (Cal. Code Regs., tit. 10, § 2644.12, subd. (a) [as amended in 2007].) Application of the efficiency standard ensures that the total expenses the Exchanges incur—which include the AIF fees—do not exceed a certain percentage of the earned premiums. But it does not determine whether the amounts the attorneys-in-fact collect are consistent with the fiduciary duty they owe to subscribers.

### 2. *The Filed Rate Doctrine*

Defendants also argue that, because California's "prior approval" system is analogous to the federal filed rate doctrine, Fogel's lawsuit is barred because the relief he seeks is effectively a premium refund. We disagree, because defendants' underlying presumption—that the two systems are analogous—is incorrect.

The filed rate doctrine "derives from the tariff-filing requirements of the Federal Communications Act of 1934. Under the Act, a common carrier is required to file with the FCC and keep open for public inspection 'schedules [also known as tariffs] showing all charges . . . and showing the classifications, practices, and regulations affecting such charges.' [Citation.] 'Under this doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be "the law" and to therefore "conclusively and exclusively enumerate the rights and liabilities" as between the carrier and the customer. Not only is a carrier forbidden from charging rates other than as set out in its filed tariff, but customers are also charged with notice of the terms and rates set out in that filed tariff and may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff.' [Citation.] [¶] . . . Thus, the filed rate doctrine bars not only lawsuits challenging filed rates or seeking to enforce rates different from the filed rates, but also lawsuits challenging services, billing or other practices when the challenge, if successful, would effectively result in a modification of the filed tariff through the award of damages. [Citations.]" (*Gallivan v. AT&T Corp.* (2004) 124 Cal.App.4th 1377, 1381–1382 [21 Cal.Rptr.3d 898].)

■ Although there are some similarities between the federal tariff system and California's "prior approval" system governing insurance rates, there is a key distinction. Under the federal system, once the filed tariff is approved, the carrier must charge that tariff and cannot offer rebates to its customers. (See, e.g., *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 224 [141 L.Ed.2d 222, 118 S.Ct. 1956]; *Duggal v. G.E. Capital Communications Services, Inc.* (2000) 81 Cal.App.4th 81, 87–89 [96 Cal.Rptr.2d 383].) It logically follows that customers cannot be allowed to effectively obtain rebates through lawsuits seeking damages. But under California's system regulating insurance rates, insurers are allowed to rebate excess premiums to their policyholders. (§§ 1420, 1860.) Thus, even if the filed rate doctrine applied in the context of a rate approved by a *state* regulatory agency (defendants have pointed to no cases in which it was), it nevertheless would have no application here.

### 3. *Waiver, Estoppel, and Incorporation by Reference*

The other issue raised in defendants' motion for summary judgment addressed Fogel's claim that he was entitled to recover all of the AIF fees defendants collected because he did not sign any subscription agreements. The trial court found that Fogel authorized defendants to collect AIF fees because the subscription agreements were incorporated by reference into Fogel's policies, and that Fogel waived or is estopped from complaining that he did not authorize the collection of those fees. On appeal, Fogel contends the evidence shows that the subscription agreement was not incorporated by reference into the policies, and that waiver and estoppel do not apply. Although we agree the evidence does not support the trial court's finding that the subscription agreement was incorporated by reference, the evidence does support the court's finding regarding waiver and estoppel. The latter finding does not justify summary judgment in favor of defendants, however, because it does not resolve whether defendants collected *excessive* fees in breach of their fiduciary duty to Fogel.

The evidence presented to the trial court established that each of the policies issued to Fogel contained the following language: "This policy is made and accepted in consideration of your premium payment to us. It is also in consideration of the power of attorney you signed as part of your application and the information you gave to us on your application. Some of your statements actually become a part of the policy which we call 'The Declarations.' [¶] When you signed the power of attorney authority on your application, you authorized the [relevant attorney-in-fact] to execute interinsurance policies between you and other subscribers."

■ Defendants argued in support of their summary judgment motion that this language incorporated the subscription agreement into the policy, citing *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44 [67 Cal.Rptr.2d 850]. As the court in *Shaw* explained, in order for a document to be incorporated by reference into a contract, " ' "the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." ' " (*Id.* at p. 54.) Defendants contended that all of the elements were met in this case because Fogel is deemed to have read his policies (*Hadland v. NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578, 1586 [30 Cal.Rptr.2d 88]), the reference to the subscription agreement was clear, and the subscription agreement was easily available to Fogel.

Fogel argued in the trial court, and argues here, that the subscription agreement could not be incorporated by reference into the policies for several reasons. We need address only two.

First, Fogel contends the Department of Insurance requires a power of attorney appointing an attorney-in-fact for a reciprocal insurance exchange to be in writing and signed by the subscriber, and forbids policy language indicating that a subscriber is deemed to have complied with that requirement by accepting the policy. As support for his contention, Fogel points to a 1956 memorandum from the Commissioner, in which the Commissioner states, "It is a fundamental principle of law and the unvarying policy of the Insurance Department that each and every subscriber to a reciprocal exchange must execute a power of attorney upon a form approved by this Department and in every case in writing signed by the subscriber. As to signature this means literally by the subscriber. . . . [¶] . . . No policy forms of reciprocal exchanges are to contain any provision to the effect that by the acceptance of a policy the subscriber is deemed to have complied with the above stated requirements as to the actual execution in writing of a power of attorney." (Underlining omitted.) While this memorandum—which appears to be an internal directive to department employees regarding a special investigation to be conducted, the approval of policy forms, and other matters—strongly suggests that the subscription agreements in this case should not be found to be incorporated by reference into Fogel's policies, it is insufficient to establish that such incorporation is precluded as a matter of law. Fogel points to no applicable statute or regulation that requires the power of attorney to be in writing, and we have found none.

Second, Fogel argues that, in any event, the policy language at issue does not satisfy the elements required to incorporate by reference the subscription agreement. We agree. Contrary to defendants' assertions, the policy language does not clearly and unequivocally refer to the subscription agreement. It refers to a power of attorney. Moreover, it states only that the power of attorney authorized the attorney-in-fact to execute interinsurance policies between the policyholder and other subscribers. Thus, the reference not only did not identify the subscription agreement by its title, it inaccurately stated the scope of authority the agreement gave to the attorney-in-fact. Therefore, we hold the subscription agreement was not incorporated by reference into the policies. (See *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 643 [223 Cal.Rptr. 838].)

This is not to say that the policy language is insufficient to find that Fogel waived or is estopped to argue that he did not authorize defendants to act as his attorney-in-fact and collect reasonable fees for doing so. By accepting the insurance policies, Fogel consented to all of the obligations arising from them, including the obligation to appoint defendants as his attorneys-in-fact. (Civ. Code, § 1589 ["A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting."]; see also Evid. Code, § 623 ["Whenever a party has, by his own statement or conduct,

intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."].) Inasmuch as defendants provided services from which Fogel benefitted—at the very least, Fogel impliedly agreed that defendants would execute and exchange insurance contracts, which is necessary for the operation of an interinsurance exchange (see, e.g., § 1305)—he is obligated to pay defendants the reasonable value of those services.[11] (See, e.g., 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1036, p. 1127 ["Where one person renders services to another from which the latter derives benefit, ordinarily an obligation arises to pay their reasonable value."].)

### 4. *Summary Adjudication Issues*

In addition to seeking summary judgment, defendants sought summary adjudication of 38 issues, which can be described in the following categories: (1) whether Fogel has standing to represent non-California residents or whether non-California residents have claims; (2) whether each defendant is entitled to summary adjudication of claims by insureds of exchanges for which that defendant is not the attorney-in-fact; (3) whether defendants are entitled to summary adjudication of claims by insureds who signed a subscription agreement; (4) whether defendants are entitled to summary adjudication of claims by insureds who did not sign a subscription agreement; (5) whether defendants are entitled to summary adjudication of the claims of "unlawful" conduct under the unfair competition law claim; (6) whether defendants are entitled to summary adjudication of the claims of "unfair" conduct under the unfair competition law claim; and (7) whether defendants are entitled to summary adjudication of the claims of "fraudulent" conduct under the unfair competition law claim.

The trial court did not address any of these issues, having granted summary judgment to defendants on the ground that all claims were barred by section 1860.1. Fogel did not address any of the issues in his opening brief on appeal, but defendants addressed the first issue in their respondents' brief, arguing that they were entitled to judgment as to all claims alleged on behalf of non-California residents. To the extent defendants seek to adjudicate the claims of absent class members, their request is improper because the court does not have jurisdiction over those class members until the class members are notified and given an opportunity to opt out of the lawsuit. (*Home Sav. & Loan Assn. v. Superior Court* (1974) 42 Cal.App.3d 1006, 1010–1011 [117 Cal.Rptr. 485].) To the extent defendants seek to adjudicate the adequacy of Fogel as a class representative, that is an issue better suited to a class

---

[11] We express no opinion as to the scope of services for which Fogel is obligated to pay AIF fees.

certification proceeding. In any event, the record and briefing on this issue, both here and below, are wholly inadequate for any such determination.[12]

### B. Fogel's Appeal from the Denial of His Motion for Summary Adjudication

As noted, Fogel moved for summary adjudication of four issues, three of which sought to adjudicate affirmative defenses related to defendants' contention that Fogel's claims raise issues involving ratemaking that must be addressed to the Commissioner. Defendants conceded one of the issues (that Fogel's claims should not be abated or dismissed under the primary jurisdiction rule), and the other two involved the immunity issues raised in defendants' motion for summary judgment. With the fourth issue, Fogel sought an adjudication that he was entitled to recover the AIF fees defendants collected because he had not signed a power of attorney appointing them his attorneys-in-fact. The trial court ruled that, even if defendants were not entitled to summary judgment, Fogel's motion could not be granted because there was a triable issue of fact regarding whether he signed the subscription agreements, and because "Fogel is deemed to have authorized defendants to provide AIF services by accepting the benefits of his insurance policy."

On appeal, Fogel argues the trial court erred in denying his motion as to two issues: the subscription agreement issue and one of the issues involving defendants' claim of immunity. We agree as to the latter issue, but disagree as to the former.[13]

■ Fogel correctly contends the trial court should have granted his motion for summary adjudication that the exhaustion of administrative remedies rule does not bar his claims. " 'The requirement of exhaustion of administrative remedies is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal.' " (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 199 [51 Cal.Rptr.2d 622].) The rule " 'applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course.' " (*Farmers Ins.*

---

[12] Defendants conceded at oral argument that they do not challenge claims or issues related to the absent class members.

[13] Because the parties do not raise it, we do not address whether the denial of a summary adjudication motion is reviewable on appeal from the judgment. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2006) ¶ 2:242.1, p. 2-115 (rev. #1, 2006).)

*Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 [6 Cal.Rptr.2d 487, 826 P.2d 730], italics omitted.) As discussed above, the collection of AIF fees is not a matter regulated by Chapter 9. Therefore, Fogel was not required to bring his claims based upon the collection of those fees in an administrative proceeding under Chapter 9. Hence, he was entitled to summary adjudication of defendants' exhaustion of administrative remedies affirmative defense.

Fogel is not, however, entitled to summary adjudication of the subscription agreement issue. The issue as set forth in his motion states: "Plaintiff shall recover from Defendants the fees they have collected for acting as Plaintiff's attorney-in-fact because Plaintiff has not signed a power of attorney that appoints Defendants to act in this capacity or that authorizes any fee to be charged as required by California law." He argues that although defendants produced documents that purport to be subscription agreements he signed related to old policies he once held, they failed to produce evidence to dispute his declaration that he did not sign a subscription agreement in connection with the policies he currently holds with the Exchanges. We need not determine whether defendants' evidence raises a disputed issue, however, because even if it does not, Fogel would not be entitled to summary adjudication. As discussed in section A.3., *ante*, even if Fogel did not sign a power of attorney, he authorized defendants to act as his attorney-in-fact to execute and exchange insurance contracts, at the very least, and defendants are entitled to reasonable fees for their services. (See fn. 11, *ante*.) Therefore, the trial court did not err by denying summary adjudication of this issue.

## C. *Defendants' Cross-appeal*

In their cross-appeal, defendants contend the trial court abused its discretion in granting Fogel leave to amend his complaint after defendants filed their first motion for summary judgment.[14] They argue that Fogel's amendments changed or deleted factual allegations that undermined his claims, and therefore should have been rejected. We disagree.

" 'There is a policy of great liberality in permitting amendments to the pleadings at any stage of the proceeding. [Citations.] An application to amend a pleading is addressed to the trial judge's sound discretion. [Citation.] On appeal the trial court's ruling will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.] The burden is on the [party opposing the amendment] to demonstrate that the trial court abused its discretion.' [Citation.] . . . '[I]t is an abuse of discretion to deny leave to amend where the

---

[14] The parties dispute whether an order granting leave to amend is reviewable on appeal from the final judgment. It is. (*Bank of America v. Superior Court* (1942) 20 Cal.2d 697, 703 [128 P.2d 357] [an "order granting leave to amend, while not directly appealable, is subject to review on appeal from the final judgment"].)

opposing party was not misled or prejudiced by the amendment. [Citation.]' " (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945 [65 Cal.Rptr.2d 777].)

Defendants point to four changes in the amended complaint that they contend were improper: (1) the original complaint alleged that Fogel and the other policyholders appointed attorneys-in-fact, but the amended complaint alleges that he and policyholders did not sign powers of attorney; (2) the amended complaint dropped the allegation that the attorneys-in-fact collected their AIF fees "through the Exchanges"; (3) the amended complaint dropped the allegation that the Exchanges used the allegedly excessive AIF fees to justify rate increases; and (4) the amended complaint dropped the allegation that these rate increases improperly increased the policyholders' insurance premiums. None of these changes prejudiced defendants in any way.

■ As Fogel explained in his motion seeking leave to amend the complaint, the first change was in response to defendants' first motion for summary judgment, in which they argued that Fogel's claims were barred because subscribers to the Exchanges all signed subscription agreements. Since Fogel did not remember signing any such agreement and defendants apparently could not produce any subscription agreement he signed (at least, at the time he filed his motion), he sought to amend the complaint to correct what appeared to be an inadvertent misstatement. Such an amendment is permitted under our liberal pleading rules. (*Berman v. Bromberg, supra,* 56 Cal.App.4th at p. 945.) In any event, in light of our ruling that Fogel is deemed to have appointed defendants as his attorney-in-fact by having accepted the policies, defendants have suffered no prejudice by the amendment.

The second change—the omission of the allegation that the attorneys-in-fact collected their AIF fees "through the Exchanges"—did not affect Fogel's claim at all. As we discussed in section A.1., *ante,* the fact that the attorneys-in-fact collect a percentage of the premiums as their AIF fees does not make their collection of the fees an act authorized by Chapter 9 and thus potentially immunized by section 1860.1.

The third and fourth omissions defendants complain of are allegations from Fogel's original fraud claim, which Fogel dismissed. Fogel had a right to voluntarily dismiss that claim, because he did so before his opposition to defendants' first motion for summary judgment was due. (See *Zapanta v. Universal Care, Inc.* (2003) 107 Cal.App.4th 1167, 1173–1174 [132 Cal.Rptr.2d 842].)

In short, defendants have failed to show that the trial court abused its discretion by allowing Fogel to amend his complaint.

## DISPOSITION

The judgment in favor of defendants is reversed. The matter is remanded and the trial court is directed to enter an order denying defendants' summary judgment motion and granting Fogel's motion to summarily adjudicate the exhaustion of administrative remedies affirmative defense. Fogel shall recover his costs on appeal.

Manella, J., and Suzukawa, J., concurred.

On April 7, 2008, the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied June 11, 2008, S163047.