[No. B220469. Second Dist., Div. Three. Oct. 6, 2010.]

AMBER MACKAY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
21ST CENTURY INSURANCE COMPANY, Real Party in Interest.

[No. B223772. Second Dist. Oct. 6, 2010.]

21ST CENTURY INSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
AMBER MACKAY et al., Real Parties in Interest.

## COUNSEL

Roxborough, Pomerance, Nye & Adreani, Drew E. Pomerance; Goshgarian & Marshall, Mark Goshgarian and Merak Eskigian for Petitioners and for Real Parties in Interest Amber MacKay and Jacqueline Leacy.

Kabateck Brown Kellner and Brian S. Kabateck for Consumer Attorneys of California as Amicus Curiae on behalf of Petitioners and Real Parties in Interest Amber MacKay et al.

No appearance for Respondent.

Barger & Wolen, Kent R. Keller, Steven H. Weinstein, Marina M. Karvelas and Peter Sindhuphak for Petitioner and for Real Party in Interest 21st Century Insurance Company.

Sedgwick, Detert, Moran & Arnold and Vanessa O. Wells for Personal Insurance Federation of California, Association of California Insurance Companies and American Insurance Association as Amici Curiae on behalf of Petitioner and Real Party in Interest 21st Century Insurance Company.

## OPINION

**CROSKEY, J.**—In California, a casualty insurance company cannot charge a rate unless the rate is part of a rate plan which has been approved in advance by the Department of Insurance (DOI). The Insurance Code provides specific administrative remedies which may be pursued in order to challenge a rate as illegal, even after the rate has been approved. Judicial review of the administrative proceedings is available by means of a petition for writ of mandate. In this case, the insureds attempted to pursue their administrative remedy, but after the DOI declined to hold a hearing, the insureds filed a civil action against the insurer, rather than seeking judicial review of the DOI's administrative decision to decline jurisdiction. The principal question presented by these writ proceedings is whether, after a rate has been approved, an insured

may pursue a civil action to challenge what it believes to be an illegal rate. We conclude that the statutory provisions for an administrative process (and judicial review thereof) are the exclusive means of challenging an approved rate. As there is no triable issue of fact as to the issue of the approval of the rates at issue in this case, we conclude the insurer is entitled to summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 2001, Dana Poss filed an action against 21st Century Insurance Company (21st Century) challenging two of its rating practices as violative of the Insurance Code. Under Insurance Code section 1861.02, there are certain factors which *must* be considered in determining automobile insurance rates; there are other factors which *may* be considered. Subdivision (c) of Insurance Code section 1861.02 provides, in pertinent part, "The absence of prior automobile insurance coverage, *in and of itself*, shall not be a criterion for determining eligibility for a Good Driver Discount policy,[1] or generally for automobile rates, premiums, or insurability." (Italics added.) At issue in this case are two rating practices which are alleged to violate this provision, "accident verification," and "persistency."

It is undisputed that one of the mandatory factors to be considered in ratesetting, indeed, the factor to be given the most weight, is the "insured's driving safety record." (Ins. Code, § 1861.02, subd. (a)(1).) 21st Century had four ways of determining an applicant's driving safety record, although three of the four methods depended on the applicant then having insurance,[2] and not all applicants who were uninsured were eligible to use the fourth method.[3] It is alleged that, as most applicants would be unable to verify their driving records in the absence of prior insurance, 21st Century's "accident verification" practices violated the prohibition on the use of the "absence of

---

[1] Insurance Code section 1861.02, subdivision (b) requires insurers to offer a "Good Driver Discount" policy to insureds meeting established qualifications.

[2] These methods were: (1) a letter of experience from the applicant's current/prior insurer; (2) a current renewal offer from the applicant's current/prior insurer including years insured and claims history; and (3) policy information from the applicant's current/prior insurer including years insured and claims history.

[3] The fourth method was "[a]n acceptable form of written verification of an accident driving record . . . from a disinterested third party." Examples included a claims history report from a third party loss reporting agency, a letter from the insured's employer setting forth accident history if the insured had been driving a company car, and a letter from the insured's commanding officer if the insured had been in the military stationed overseas. There was no option for an applicant to verify his or her own driving record.

prior automobile insurance coverage, in and of itself, [as] a criterion for determining . . . automobile rates, premiums, or insurability."[4]

Similarly, one of the factors which an insurance company may consider in ratesetting is "[p]ersistency." (Cal. Code Regs., tit. 10, § 2632.5(d)(11).) The applicable regulation was initially silent as to the definition of "persistency," and insurance companies used two different interpretations: (1) "loyalty persistency," which referred to an insured's previous coverage with the insurer itself or a related entity; or (2) "portable persistency," which referred to an insured's previous coverage with *any* insurer. (*Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1360–1361 [34 Cal.Rptr.3d 354].) It is alleged that 21st Century's use of "portable persistency" violated the prohibition on the use of the "*absence of prior automobile insurance coverage, in and of itself, [as] a criterion for determining . . . automobile rates, premiums, or insurability.*"[5]

Poss filed his action challenging 21st Century's accident verification and persistency practices under Business and Professions Code section 17200, proceeding as a private attorney general on behalf of the general public. Poss and 21st Century then stipulated to a voluntary dismissal without prejudice, and a tolling agreement, in order to permit Poss to pursue his administrative remedy before the DOI. Poss filed a formal complaint with the DOI, and requested a hearing. On January 29, 2002, the DOI declined to exercise jurisdiction as the DOI was proposing new regulations to resolve the issue of persistency. After further communications were exchanged, the DOI issued a similar order on April 25, 2002, declining jurisdiction over the issue of accident verification, as the DOI was similarly addressing the issue in a proposed regulation.

Believing that the DOI "has done all it [wa]s going to do," and further believing that the administrative remedy is not the exclusive means of challenging approved rates, Poss's counsel filed a new civil action against 21st Century. The operative complaint is the second amended complaint; the plaintiffs are now Amber MacKay and Jacqueline Leacy, suing on behalf of themselves and all others similarly situated.

Class certification was granted. The class is defined as "[a]ll persons who purchased automobile insurance from 21st Century at any time from October 1, 1997 through October 31, 2005 and who paid increased premiums due to a

---

[4] We express no opinion on whether 21st Century's accident verification practices did, in fact, violate this statutory provision.

[5] In 2003, the Legislature enacted a statute which permitted insurers to use portable persistency as a rating factor. (*Foundation for Taxpayer & Consumer Rights v. Garamendi, supra,* 132 Cal.App.4th at p. 1362.) The statute was determined to be invalid. (*Id.* at p. 1362.)

lack of prior insurance." The definition includes "all those individuals who paid increased premiums because they could not verify their accident record due to a lack of prior insurance, as well as all of those individuals who paid increased premiums because they were not 'persistent' due to a lack of prior insurance."

21st Century moved for summary adjudication regarding its use of portable persistency. While 21st Century raised multiple legal theories, the one with which we are concerned was 21st Century's argument that every time it used the rating factor of portable persistency, it did so pursuant to a rating plan which had been approved by the DOI. Although plaintiffs initially opposed the motion for summary adjudication on the basis that there was a triable issue of fact as to whether the DOI had actually reviewed those elements of 21st Century's rating plans which specifically referenced portable persistency, they do not pursue that challenge in the instant writ proceeding. A hearing was held before Judge John Shepard Wiley, Jr., who ultimately granted summary adjudication on the basis that challenges to approved rates may only be made via the administrative procedure set forth in the Insurance Code, not by means of separate civil action under Business and Professions Code section 17200.

Plaintiffs filed a petition for writ of mandate (No. B220469) on November 24, 2009. However, by this time, 21st Century had moved for summary adjudication regarding the accident verification factor. We deferred ruling on plaintiffs' writ petition pending a trial court ruling on the accident verification summary adjudication motion. At the January 28, 2010 hearing, the trial judge, now Judge Anthony J. Mohr, indicated his tentative belief that Judge Wiley's interpretation of the law was correct. However, Judge Mohr was concerned that, with respect to accident verification, there was a triable issue of fact as to whether that rating factor had actually been approved by the DOI. The court ultimately issued a ruling declining to reach the legal issue, as the evidence failed to clearly establish that 21st Century's use of accident verification had been approved by the DOI. Thus, summary adjudication was denied. 21st Century filed its own petition for writ of mandate (No. B223772). We have consolidated the two petitions for hearing and disposition in a single opinion.

## ISSUES PRESENTED

We first consider the factual issue; that is, whether a triable issue of fact exists as to the approval by the DOI of 21st Century's use of accident verification. We conclude that no triable issue of fact exists. Second, we turn to the legal issue; that is, whether the approval of a rating factor by the DOI precludes a civil action against the insurer challenging the use of that rating factor. We conclude that it does.

## DISCUSSION

### 1. Standard of Review

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier* v. *Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065 [225 Cal.Rptr. 203].)" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc.* v. *Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

### 2. The Accident Verification Factor Was Approved by the DOI

21st Century's use of the accident verification factor, and the DOI's approval thereof, during the class period of October 1997 through October 2005, is somewhat complex. The plaintiffs do not dispute that 21st Century's use of accident verification was included in the papers that it submitted to the DOI. However, they contend that accident verification was not an approved *rating factor*, but only an unapproved *underwriting guideline*. Indeed, plaintiffs point to evidence in some DOI approval letters stating, "If any portion of the application or related documentation conflicts with California law, that portion is specifically not approved.[6] *This approval does not constitute an*

---

[6] We are not long detained by plaintiffs' suggestion that, by including this provision in its approval letters, the DOI can, as a general matter, prospectively disapprove any rating factor which may subsequently be determined to have been in conflict with California law. Insurers

*approval of underwriting guidelines* nor the specific language, coverages, terms, covenants and conditions contained in any forms, or of the forms themselves. Policy forms and *underwriting guidelines included in this filing were reviewed only insofar as they relate to rates contained in this filing* or currently on file with the [DOI]." (Italics added.)

Applicable regulations define "rating factor" as "any factor, including discounts, used by an insurer which establishes or affects the rates, premiums, or charges assessed for a policy of automobile insurance." (Cal. Code Regs., tit. 10, § 2632.2, subd. (a).) There is no definition provided for the term "underwriting guideline."[7] Mike Edwards, the person most knowledgeable at the DOI regarding the approval of class plans, testified that the two terms are "very close." It appears that the elements of the rules which determine premiums are rating factors, but the utilization of those elements is considered underwriting. In our view, the distinction is an unnecessary one, as the relevant difference, in this case, depends on the language submitted to the DOI for approval. For example, an insurer could submit to the DOI a rate plan indicating the use of a "driving safety record," and setting forth (mathematically) the impact of a "good" and "bad" safety record on an insured's premiums, but if the insurer then determined, as an internal matter, that an applicant's age or gender would be used as a proxy for driving safety, the use of age or gender would be an unapproved underwriting guideline. However, if the same insurer instead submitted for DOI approval a rate plan which included, among the factors to be given weight in determining a premium, an applicant's age or gender, such use would then be a "rating

---

are statutorily prohibited from charging a rate which has not been preapproved by the DOI. (Ins. Code, § 1861.01, subd. (c).) An approved rate has the imprimatur of the DOI; it has been approved as compliant with the law, to the best of the DOI's determination. If that rate is subsequently determined to have been illegal, the insurer may no longer charge the rate, but that cannot retroactively invalidate the DOI's prior approval. Insurance Code section 1858.07, subdivision (a) provides for a civil penalty for the use of "any rate, rating plan, or rating system in violation of this chapter." However, subdivision (b) of that section provides that "no penalty shall be imposed by the [DOI] if a person has used any rate, rating plan, or rating system that has been approved for use by the commissioner in accordance with the provisions of this chapter." (Ins. Code, § 1858.07, subd. (b).) Subdivision (b) would be unnecessary if DOI approval of a rate later determined to be illegal had no legal efficacy prior to the time of such determination. Put another way, the insurer's use of an approved rate is condemned or prohibited only prospectively from the time it is determined to be illegal.

[7] In *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700 [113 Cal.Rptr.2d 399], we considered the meaning of "underwriting rule" for the purpose of Insurance Code section 1858, subdivision (a), which provides an administrative remedy for any person "aggrieved by any rate charged, rating plan, rating system, or underwriting rule" followed or adopted by an insurer. We concluded that an underwriting rule "is properly characterized as a rule followed or adopted by an insurer . . . which either (1) *limits* the conditions under which a policy will be issued or (2) *impacts* the rates that will be charged for that policy." (*Smith v. State Farm Mutual Automobile Ins. Co., supra*, 93 Cal.App.4th at p. 726.) Our discussion is not inconsistent with this definition.

factor." Thus, the issue is not whether a particular factor (in this example, age or gender) is, standing alone, to be called a "rating factor" or an "underwriting guideline." Instead, the issue is whether it is submitted to the DOI as a factor affecting the rates to be charged.

In this case, we conclude that 21st Century's use of accident verification was, in fact, a rating factor approved by the DOI. As we now explain, the Commissioner of Insurance (commissioner) adopted a stipulation, in an enforcement action, that 21st Century's use of accident verification was, in fact, approved by the DOI.

We are here concerned with the use of accident verification from October 1, 1997, through October 31, 2005. In early 1997, 21st Century submitted a rate plan for approval. On May 15, 1997, during the approval process, 21st Century wrote the DOI a letter specifically indicating that one of the changes to its then current rates was that it sought to use accident verification. 21st Century submitted an exhibit to the DOI clearly explaining its use of accident verification, and indicating that it would go into effect for policies originating after October 1, 1997. The DOI responded that it no longer had issues with 21st Century's submitted rate plan, and subsequently approved it.

On October 17, 1997, 21st Century submitted a new rate plan, although the new rate plan made no changes to the accident verification factor. 21st Century did not submit another new rate plan until 2000. Thus, in 1998, the rate plan in effect, with respect to accident verification, was the rate plan that went into effect on October 1, 1997, at the start of the class period.

In 1998, the DOI conducted a field rating and underwriting examination of 21st Century. This examination was conducted by Jerome Tu, a senior insurance rate analyst within the Field Rating and Underwriting Bureau at the DOI. Tu's job was not to approve rating plans, but to conduct examinations of insurance companies to determine whether they were in compliance with the applicable laws and regulations. As a result of Tu's 1998 examination of 21st Century, he was concerned that 21st Century's use of accident verification violated Insurance Code section 1861.02, subdivision (c). 21st Century disagreed with Tu's determination and declined to make any changes to its use of accident verification. 21st Century indicated that it would wait for a response from DOI's legal division.[8] Although no response was forthcoming, the DOI did not pursue an enforcement action against 21st Century for this purported code violation.

---

[8] Shawna Ackerman worked for the DOI from 1989 through 1998, in positions ranging from insurance rate analyst to senior casualty actuary. 21st Century submitted deposition testimony from Ackerman indicating that, during her time at the DOI, the topic of whether accident verification was a permissible rating factor was a subject of discussion, with the DOI

In 2001, Tu conducted another examination of 21st Century. In January 2002, a letter was sent to 21st Century setting forth the results of that examination, and again challenging 21st Century's use of accident verification. In the letter, Tu expressed his belief that 21st Century remained out of compliance with the law ever since he had raised the concern following the 1998 examination. 21st Century again disagreed. Ultimately, Tu submitted his final report to the commissioner, setting forth his position that 21st Century's use of accident verification was improper, and including a summary of 21st Century's belief that its use of accident verification was not illegal, and, in fact, had always been approved. The issue was presented to the commissioner by Tu as "unresolved." In August 2003, 21st Century responded with a letter to the commissioner, indicating its position regarding the legality, and prior approval, of accident verification.[9]

In 2006, the DOI brought an enforcement action against 21st Century, arising out of Tu's 2001 examination. In 2007, the enforcement action was resolved by means of a consent order. The consent order identified 14 "rating and underwriting practices" which had been criticized by the DOI, the first of which was, "application of a non-verifiable driving record surcharge," which is the accident verification factor. As to this practice, 21st Century and the DOI agreed, "the practices and rates that were the subject of this criticism had been submitted to and approved by the [DOI] in rate filings."[10] On April 2, 2007, the commissioner adopted the consent order.

In sum, the 2006 enforcement action was based on the 2001 field rating and underwriting examination, which itself challenged 21st Century's use of accident verification going back as far as the 1998 examination. Yet the 2006 enforcement action was resolved by a consent order, *adopted by the commissioner*, which stipulated that the accident verification factor was a "practice[] and rate[] that . . . had been submitted to and approved by the [DOI] in rate

---

ultimately concluding that accident verification was, in fact, approvable. Mike Edwards also testified to vaguely remembering that, in the late 1990's, "the issue of accident verification became an issue of discussion within the [DOI], and the ultimate result of those discussions [was] essentially a direction that the accident—direction from executive staff filtered down through to us that the accident verification process was allowable."

[9] In the interim, on November 30, 2002, the DOI had adopted a new regulation which required insurers to permit drivers to certify their own driving history by means of a declaration under penalty of perjury. (Cal. Code Regs., tit. 10, § 2632.13, subd. (i).) The regulation gave insurers 120 days to file complying rate plans. (*Ibid.*) On January 6, 2003, 21st Century submitted a new plan which permitted drivers to self-certify. However, with the DOI's approval, this change was not put into effect for a number of years.

[10] They also agreed that 21st Century had since changed its practices and the challenged practices were no longer used.

filings." When the commissioner himself has stipulated that the DOI approved the rating factor in question, there can be no disputing the approval.[11]

The trial court denied summary adjudication on the basis that the DOI's initial approval of the accident verification factor had not been a *knowing* approval. Instead, the court concluded that 21st Century's plan had been simply *deemed approved* as the time period for the DOI to act had expired before the DOI could disapprove. This was based on an excerpt from the deposition of Mike Edwards, who testified that there was one filing from 21st Century which inappropriately included, as a rating factor, whether the applicant had prior insurance. This was the one filing that, in Edwards's entire history at the DOI, was deemed approved due to the passage of time, although he felt the filing was improper. Edwards thereafter reported to his superior that this filing should not have been approved. Edwards could not recall what happened, but believed that the DOI might have made an attempt to get 21st Century not to put the plan into practice. The trial court concluded that a triable issue of fact existed as to whether the DOI actually approved the use of the accident verification factor, given (1) the rating plan was deemed approved only because of the passage of time; (2) the DOI attempted to prevent 21st Century from putting the plan into practice; and (3) Tu's report shortly thereafter indicated to 21st Century his disagreement with the propriety of the rating factor.

However, in the instant writ proceeding, 21st Century has augmented the record with the entirety of Edwards's deposition, which had not been before the trial court. Upon review of the complete deposition, it is apparent that the rate plan which was deemed approved by passage of time *was not a rate plan including accident verification.* Instead, Edwards was speaking of a *1994* filing, which predated the period at issue in this litigation, in which 21st Century had expressly included as a rating factor whether the applicant had prior insurance. The fact that 21st Century's 1994 rate plan, which did *not* include accident verification, was deemed approved by the passage of time cannot undermine the conclusion that the *subsequent* plans which did include that factor were approved by the DOI. As the commissioner adopted a consent order in which it was stipulated that accident verification had, in fact, been approved, and there is no evidence that *these* approvals occurred solely due to the passage of time, we conclude there is no triable issue of fact.

---

[11] In 21st Century's separate statement of undisputed facts in support of its motion for summary adjudication, 21st Century proposed the undisputed fact that the DOI had agreed, in the consent order, that these practices and rates "had been submitted to and approved by the [DOI] in rate filings." Plaintiffs disputed the fact only on the bases that the DOI cannot approve an illegal practice and that it does not "approve underwriting guidelines, which is what 21st Century's accident verification procedures are." Plaintiffs' bases for dispute cannot undermine the commissioner's adoption of the stipulation that these practices and rates had actually been approved. (See fn. 6, *ante*.)

### 3. *Prior Approval of a Rate Precludes a Civil Action Challenging It*

■ As both persistency and accident verification were approved by the DOI as part of rate plans filed by 21st Century, we now turn to the heart of the matter at issue in these writ proceedings: whether a rate which has been previously approved by the DOI may only be challenged by means of the administrative procedure (with judicial review) set forth in the Insurance Code.

#### a. *The Relevant Statutory Language*

Our discussion of the statutory language will revolve around three statutes, two of which appear to be contradicted by the third. Before we address those statutes however, a brief discussion of context is necessary.

Division 1 of the Insurance Code is entitled, "General Rules Governing Insurance." Part 1 of division 1 is entitled, "The Contract," while part 2 of division 1 is entitled, "The Business of Insurance." We are concerned with the latter. The "Business of Insurance" part consists of several chapters, covering topics as diverse as "Reciprocal Insurers" (ch. 3), "Bail Licenses" (ch. 7), and the "Insurance Frauds Prevention Act" (ch. 12). We are here concerned with chapter 9 of the "Business of Insurance" part, governing "Rates and Rating and Other Organizations."

■ Article 10 of chapter 9 of part 2 of division 1 of the Insurance Code is entitled "Reduction and Control of Insurance Rates." It was adopted by the voters by Proposition 103, approved November 8, 1988. Pursuant to this article, beginning on November 8, 1989, "insurance rates subject to this chapter must be approved by the commissioner prior to their use."[12] (Ins. Code, § 1861.01, subd. (c).) A procedure was established whereby (1) an insurer who desires to change a rate files a rate plan application with the commissioner (Ins. Code, § 1861.05, subd. (b)); (2) the commissioner gives notice to the public of the application (Ins. Code, § 1861.05, subd. (c)); (3) a consumer may request a public hearing, or the commissioner may decide on his or her own motion to hold one (Ins. Code, § 1861.05, subd. (c)); and (4) the rate is deemed approved unless the commissioner disapproves it (Ins. Code, § 1861.05, subd. (c)). Judicial review of the commissioner's decision, including the decision not to hold a hearing, is available. (Ins. Code, § 1861.09.)

---

[12] Prior to the adoption of Proposition 103, California was a so-called "open rate" state, meaning that rates were set by insurers without prior or subsequent approval by the commissioner. The commissioner was empowered to prohibit a rate only if a reasonable degree of competition did not exist in the area and the rate was found to be excessive, inadequate, or unfairly discriminatory. (*California Auto. Assigned Risk Plan v. Garamendi* (1991) 232 Cal.App.3d 904, 909–910 [283 Cal.Rptr. 562].)

After a rate has been approved by the commissioner, it is still possible for an insured to challenge it. The procedure for such a challenge is set out in article 7 of chapter 9 of part 2 of division 1 of the Insurance Code ("Hearings, Procedure and Judicial Review"). "Any person aggrieved by any rate charged, rating plan, rating system, or underwriting rule followed or adopted by an insurer . . . may file a written complaint with the commissioner requesting that the commissioner review the manner in which the rate, plan, system, or rule has been applied with respect to the insurance afforded to that person. In addition, the aggrieved person may file a written request for a public hearing before the commissioner, specifying the grounds relied upon." (Ins. Code, § 1858, subd. (a).) If, after a hearing, the commissioner finds a violation, the commissioner shall order that the insurer discontinue the violating practice, and may also order necessary and proper corrective action. (Ins. Code, § 1858.3, subd. (a).) "Any finding, determination, rule, ruling or order made by the commissioner under this chapter shall be subject to review by the courts of the State and proceedings on review shall be in accordance with the provisions of the Code of Civil Procedure." (Ins. Code, § 1858.6.)

In short, article 10 of chapter 9 of part 2 of division 1 of the Insurance Code provides that all rates must be approved by the commissioner prior to use, and provides a system for a consumer to seek a hearing prior to approval and judicial review of the approval. Article 7 of chapter 9 of part 2 of division 1 of the Insurance Code provides a procedure whereby a consumer can bring an administrative proceeding before the commissioner to challenge a rate subsequent to its approval, and may seek judicial review of the commissioner's decision. We now turn to the statutory provisions that are at the heart of this proceeding.

In article 9 ("Miscellaneous") of chapter 9 of part 2 of division 1 of the Insurance Code, we find Insurance Code sections 1860.1 and 1860.2. Section 1860.1 provides, "No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." Section 1860.2 provides, "The administration and enforcement of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, no other law relating to insurance and no other provisions in this code heretofore or hereafter enacted shall apply to or be construed as supplementing or modifying the provisions of this chapter unless such other law or other provision expressly so provides and specifically refers to the sections of this chapter which it intends to supplement or modify."

■ These two statutes, taken together, appear to exempt insurance rate-making (i.e., "this chapter") from the remainder of the Insurance Code (Ins.

Code, § 1860.2) and all California laws outside the chapter itself (Ins. Code, § 1860.1). Indeed, "[h]istorically, these sections have been interpreted to provide exclusive original jurisdiction over issues related to ratemaking to the commissioner." (*Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, 755 [92 Cal.Rptr.2d 132] (*Walker*).)

The third statute, however, appears to call into question whether that interpretation is still viable. Insurance Code section 1861.03, subdivision (a) is also found within chapter 9 of part 2 of division 1 of the Insurance Code, relating to ratemaking, but is part of article 10 that was added by Proposition 103. Insurance Code section 1861.03, subdivision (a) provides, "The business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act (Sections 51 to 53, inclusive, of the Civil Code), and the antitrust and unfair business practices laws (Parts 2 (commencing with Section 16600) and 3 (commencing with Section 17500) of Division 7 of the Business and Professions Code)." This statute, which makes all of "the laws of California applicable to any other business" applicable to "[t]he business of insurance," appears to contradict Insurance Code sections 1860.1 and 1860.2, which limit ratemaking enforcement to the statutes set forth in the ratemaking chapter itself. Faced with this apparent contradiction, our task is to adopt the construction that best harmonizes the statutes. (*Air Machine Com SRL v. Superior Court* (2010) 186 Cal.App.4th 414, 422 [112 Cal.Rptr.3d 482].)

■ Initially, we find no conflict between Insurance Code sections 1860.2 and 1861.03. Insurance Code section 1860.2 provides that "administration and enforcement" of the ratemaking chapter "shall be governed solely by the provisions of this chapter." It further provides that no other law relating to insurance shall apply to the provisions of this chapter, "[e]xcept as provided in this chapter." But Insurance Code section 1861.03, which makes the "business of insurance" subject to all other California laws applicable to business, *is itself part of the ratemaking chapter*, although it is located in a different and later enacted article. Thus, Insurance Code section 1861.03 clearly falls within the exception provided for in Insurance Code section 1860.2. It therefore follows that, to the extent it is alleged that an act which violates the ratemaking chapter also violates another law applicable to business generally, such as Business and Professions Code section 17200, an action under the latter statute may proceed. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 382–383 [6 Cal.Rptr.2d 487, 826 P.2d 730]; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 984–985 [11 Cal.Rptr.3d 45].)

■ We, however, reach an entirely different conclusion with respect to Insurance Code sections 1860.1 and 1861.03. As already noted, Insurance

Code section 1860.1 exempts from "any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance" any "act done, action taken or agreement made pursuant to the authority conferred by this chapter." It does not exempt all acts done "pursuant to" the chapter—which is to say, all ratemaking acts—but instead exempts acts done "pursuant to the authority conferred by this chapter." (Cf. *State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 936 [103 Cal.Rptr.2d 662, 16 P.3d 85] [noting the use of similar language in another statute].) The ratemaking chapter confers on the DOI the exclusive authority to approve insurance rating plans. An insurer charging a preapproved rate is doing an act or taking an action pursuant to the authority conferred by the chapter. (*Walker, supra*, 77 Cal.App.4th at p. 757.) Thus, Insurance Code section 1860.1 exempts such acts from "prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." That Insurance Code section 1861.03 provides that the "business of insurance shall be subject to the laws of California applicable to any other business," does not undermine this provision. The "business of insurance" is quite broad—indeed, the ratemaking chapter is only one of several chapters making up the part of the Insurance Code titled, "The Business of Insurance."

■ Our task, therefore, is to harmonize a broad statute, subjecting the entirety of the business of insurance to all California laws governing business, and a very narrow one, exempting from other California laws acts done and actions taken pursuant to the ratemaking authority conferred by the ratemaking chapter. " ' "It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." ' " (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 738 [112 Cal.Rptr.3d 439].)

■ In short, we conclude that (1) while Insurance Code section 1861.03 subjects the entirety of the business of insurance to the laws governing business generally; and (2) Insurance Code sections 1860.2 and 1861.03 taken together provide that the statutes in the ratemaking chapter of the Insurance Code may be enforced by the laws governing business generally (if applicable); nonetheless, (3) Insurance Code section 1860.1 exempts from other California laws acts done and actions taken pursuant to the ratemaking authority conferred by the ratemaking chapter, *including the charging of a preapproved rate*. (See *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 936–937 [20 Cal.Rptr.3d 485] ["The Insurance Code does not, however, displace the UCL 'except as to . . . activities related to rate setting.' [Citations.] . . . 'In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an

attempt to regulate rates,' but 'a claim that directly challenges some other activity, *such as false advertising* . . . is not rate regulation.' [Citation.] A claim predicated on a violation of the Insurance Code not related to ratemaking may thus be framed as a claim under the UCL. [Citation.]"].)

 b. *Legislative History Does Not Limit Insurance Code*
 *Section 1860.1 to Concerted Acts*

*Walker, supra*, 77 Cal.App.4th 750 supports our conclusion. That court held, "If [Insurance Code] section 1860.1 has any meaning whatsoever (which under the accepted rules of statutory construction it must), the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner pursuant to the [ratemaking chapter]." (*Id.* at p. 756.) Plaintiffs contend, however, that the legislative history of the relevant statutes compels the conclusion that *Walker* must be limited to circumstances in which the insurer defendants are charged with improper *concerted* acts; plaintiffs argue that Insurance Code section 1860.1 can have no application to a case in which a single defendant insurer is charged with improper acts it committed alone. We disagree; as discussed below, Insurance Code section 1860.1 is not so limited.

The history of Insurance Code section 1860.1 has already been discussed, at length, in several cases. (*State Comp. Ins. Fund v. Superior Court, supra*, 24 Cal.4th at pp. 938–939; *Donabedian v. Mercury Ins. Co., supra*, 116 Cal.App.4th at p. 990; *Karlin v. Zalta* (1984) 154 Cal.App.3d 953, 966–970 [201 Cal.Rptr. 379].) In summary, the statute was part of the McBride-Grunsky Insurance Regulatory Act of 1947 (McBride-Grunsky Act). In 1944, the United States Supreme Court had determined that insurance constituted interstate commerce, and was therefore subject to federal antitrust and related laws. (*United States v. South-Eastern Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162].) In 1945, Congress passed a statute (the McCarran-Ferguson Act; 15 U.S.C. § 1011 et seq.) imposing a moratorium on this application until 1948, at which time insurance would be subject to those federal laws to the extent insurance was not regulated by state law. (See generally Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2009) ¶ 14:7ff.) The McBride-Grunsky Act was California's response. (*State Comp. Ins. Fund v. Superior Court, supra*, 24 Cal.4th at pp. 938–939; *Karlin v. Zalta, supra*, 154 Cal.App.3d at pp. 966–967.) Thus, Insurance Code section 1860.1 was enacted, in the first instance, in order to immunize insurers from antitrust laws. (*Donabedian v. Mercury Ins. Co., supra*, 116 Cal.App.4th at p. 990.) This, however, is the beginning of the analysis, not the end of it.

The McBride-Grunsky Act did more than immunize insurers from antitrust laws. It enacted the entirety of chapter 9 of part 2 of division 1 of the

Insurance Code, governing "Rates and Rating and Other Organizations." It enacted provisions permitting rating organizations (Ins. Code, former §§ 1854–1854.4); permitting insurers to act in concert (Ins. Code, former § 1853); indicating the limited circumstances in which rates would be considered excessive or inadequate (Ins. Code, former § 1852); and similar provisions.

The McBride-Grunsky Act also enacted Insurance Code section 1858, which provided (and still provides)[13] an administrative remedy before the commissioner for an insured aggrieved by an insurer's rates or rating system. Insurance Code sections 1860.1 and 1860.2 rendered that administrative remedy the *exclusive* remedy for violations of the McBride-Grunsky Act. (*Karlin v. Zalta, supra,* 154 Cal.App.3d at p. 972.) Thus, while the initial motivation behind Insurance Code section 1860.1 may have been exemption from antitrust laws in particular, it was recognized that the language of the exemption was, in fact, broader. Deputy Attorney General Harold Haas wrote Governor Warren, prior to its enactment, explaining, "The exemption is a very broad one . . . . If other business regulations such as the Fair Trade Act are applicable to insurance, the exemption applies to them also." (Deputy Attorney General Harold Haas, Interdepartmental Communication to Governor Earl Warren, June 11, 1947, p. 3.)

The McBride-Grunsky Act also enacted Insurance Code former section 1850, which explained, "The purpose of this chapter is to promote the public welfare by regulating insurance rates as herein provided to the end that they shall not be excessive, inadequate or unfairly discriminatory, to authorize the existence and operation of qualified rating organizations and advisory organizations and require that specified rating services of such rating organizations be generally available to all admitted insurers, and to authorize cooperation between insurers in rate making and other related matters. [¶] It is the express intent of this chapter to permit and encourage competition between insurers on a sound financial basis and nothing in this chapter is intended to give the Commissioner power to fix and determine a rate level by classification or otherwise."

Forty years later, the voters enacted Proposition 103. As explained earlier, Proposition 103 was a rejection of the rate setting system enacted by the McBride-Grunsky Act, and a replacement of that system with one under which all rates charged had to be preapproved by the commissioner. Proposition 103 repealed many provisions of the McBride-Grunsky Act discussed above, including those permitting rating organizations, permitting

---

[13] Insurance Code section 1858, and, indeed, much of article 7 ("Hearings, Procedure and Judicial Review") of the ratemaking chapter, was amended after its original enactment by the McBride-Grunsky Act.

insurers to act in concert, and setting forth the limited circumstances in which rates were then considered excessive or inadequate. (Ins. Code, former §§ 1854–1854.4, 1853, 1852.) It also repealed Insurance Code former section 1850, setting forth the purpose of the chapter. As a partial replacement for the repealed statutes, Proposition 103 enacted article 10 of chapter 9 of part 2 of division 1 of the Insurance Code, entitled, "Reduction and Control of Insurance Rates," requiring, among other things, an immediate rollback of insurance rates and the preapproval of future rates. (Ins. Code, § 1861.01.) Proposition 103 set forth new, stricter, standards for whether a rate is to be considered excessive or inadequate. (Ins. Code, § 1861.05, subd. (a).)

As relevant to the instant case, Proposition 103 also enacted Insurance Code section 1861.03, of which subdivision (a) makes the business of insurance subject to the laws of California applicable to any other business.[14] But of equal significance, however, is the fact that Proposition 103 left untouched Insurance Code section 1860.1, as well as the administrative enforcement mechanism set forth in Insurance Code section 1858 et seq.[15]

Under the circumstances, we believe it is inappropriate to focus on the intent of the Legislature in initially enacting Insurance Code section 1860.1; the relevant inquiry is to determine the intent of the voters in leaving that statute standing when approving Proposition 103, which repealed the great bulk of the McBride-Grunsky Act, including the provision setting forth the purpose of that act. It is difficult to believe that Insurance Code section 1860.1 is currently intended to serve the purpose it served in 1947, as the express statement of that purpose has since been repealed. Indeed, it is clear from the official ballot pamphlet analyses and arguments in connection with Proposition 103, that it was intended, in part, to repeal the then existing antitrust exemption. (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) analysis of Prop. 103 by the Legislative Analyst, pp. 98, 140 ["[I]nsurance companies are not subject to the state's anti-trust laws." The "measure makes insurance companies subject to the state's antitrust laws."]; *id.*, argument in favor of Prop. 103,

---

[14] Proposition 103 also enacted Insurance Code section 1861.10, which provides, in pertinent part, "Any person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article." (Ins. Code, § 1861.10, subd. (a).) In *Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842 [40 Cal.Rptr.3d 653], we concluded that this statute simply increased the *standing* to use procedures already extant; it did not create a private right of action for violations of the statutes enacted by Proposition 103. (137 Cal.App.4th at p. 854.)

[15] Indeed, Proposition 103 explicitly referred to this enforcement mechanism. Proposition 103 enacted Insurance Code section 1861.05, which permits the public to request a hearing on an insurer's rate application. It also enacted Insurance Code section 1861.09, which provides that "[j]udicial review shall be in accordance Section 1858.6." Insurance Code section 1858.6 was originally enacted as part of the McBride-Grunsky Act, and governs judicial review of the commissioner's administrative enforcement decisions.

p. 100 ["Proposition 103 will also end the insurers' exemption from the antimonopoly laws . . . ."]; see *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 281–282 [41 Cal.Rptr.2d 220, 895 P.2d 56].) Given that Proposition 103 was intended to eliminate insurers' exemption from antitrust laws, we cannot conclude that Insurance Code section 1860.1 is currently to be interpreted in accordance with its *initial* intent, which was to exempt insurers from antitrust laws.

For this reason, we find plaintiffs' reliance on the analysis in *State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th 930 unpersuasive. In that case, the California Supreme Court considered Insurance Code section 11758, a statute in the workers' compensation insurance context with very similar language to Insurance Code section 1860.1. At the time the alleged misconduct at issue in that case occurred, the statute which set forth the purpose of the relevant article to be the regulation of concert of action between insurers *was still in existence.* (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at p. 935.) Thus, the Supreme Court interpreted the statute in light of the then existing express purpose of the article. Our case, involving the interpretation of Insurance Code section 1860.1 *after the repeal* of the statute initially setting forth the intent of the chapter in which it appears, is thus distinguishable.

■ Plaintiffs argue that Insurance Code section 1860.1 is merely a "vestigial remnant[]" of the McBride-Grunsky Act. Such a conclusion would mean that Proposition 103 failed to repeal Insurance Code section 1860.1 by mistake. We do not assume such an intent on the part of the electorate. To the contrary, "[t]he voters are presumed to be aware of existing law . . . ." (*Farmers Ins. Exchange v. Superior Court, supra,* 137 Cal.App.4th 842, 855.) Plaintiffs argue that Insurance Code section 1860.1 can have no present application except with respect to concerted action between insurers, even though it is clear that (1) Insurance Code section 1860.1 was always understood to have a broader reach than simply an exemption from antitrust laws; and (2) Proposition 103 clearly intended to eliminate the then existing antitrust exemption.[16] In sum, we conclude that it is inappropriate to limit the

---

[16] Plaintiffs attempt to identify a situation in which their interpretation of Insurance Code section 1860.1 would not be empty. They point to subdivision (b) of Insurance Code section 1861.03. After subdivision (a) of that statute provides that the business of insurance is subject to the laws of California applicable to any other business, subdivision (b) sets forth several exceptions, specifically providing that "[n]othing in this section shall be construed to prohibit (1) any agreement to collect, compile and disseminate historical data on paid claims or reserves for reported claims, provided such data is contemporaneously transmitted to the commissioner, [and] (2) participation in any joint arrangement established by statute or the commissioner to assure availability of insurance . . . ." (Ins. Code, § 1861.03, subd. (b).) But if Insurance Code section 1861.03, subdivision (b) immunizes from prosecution under other statutes the identified concerted acts, there is no need for Insurance Code section 1860.1 to do the same thing.

interpretation of Insurance Code section 1860.1 by the now-superseded purpose for which it was initially enacted. Instead, it is properly interpreted in the context of the entirety of the ratemaking chapter, as we have done above.

### c. Case Authority Supports Our Conclusion

We have concluded that Insurance Code section 1860.1 precludes a challenge to an approved rate brought under laws outside the Insurance Code. As already discussed, this conclusion was also reached by Division Two of the First Appellate District in *Walker, supra,* 77 Cal.App.4th 750.

In *Walker,* the plaintiffs brought a putative class action against several insurers,[17] alleging causes of action seeking damages or disgorgement of allegedly excessive premiums "that the insurers have been authorized to collect." (*Walker, supra,* 77 Cal.App.4th at p. 752.) The defendant insurers successfully demurred on the basis of Insurance Code section 1860.1, and the appellate court affirmed. The court explained that, "under the statutory scheme enacted by the voters, the charging of an approved rate cannot be deemed 'illegal' or 'unfair' for purposes of the Unfair Business Practices Act or, indeed, tortious." (77 Cal.App.4th at p. 756.) The court continued that the plaintiffs' argument "seems an obvious attempt to avoid consumer participation provisions of Proposition 103 that appellants deem burdensome or impractical and thus frustrate the power granted to the commissioner by the voters to set insurance rates after soliciting both insurer and consumer input into his decision. To read section[] 1861.03 . . . as appellants urge would result in an unnecessary conflict between [that] statute[] and section 1860.1, which embodies the finality of the commissioner's ratemaking decision. Put another way, to accept appellants' argument would require violation of well-accepted principles of statutory construction." (*Id.* at p. 758.)

 The *Walker* court reached its conclusion based on statutory construction, and did not rely on the filed rate doctrine. However, the court acknowledged that the filed rate doctrine is "analogous to the scheme explicitly embodied in the Insurance Code and, to the extent it is relevant at all, is consistent with our interpretation of the statutory provisions at issue in this case." (*Walker, supra,* 77 Cal.App.4th at p. 757, fn. 4.) We agree. The filed rate doctrine provides that rates duly adopted by a regulatory agency are not subject to collateral attack in court. Numerous state courts have applied the

---

[17] The action was initially brought against more than 70 insurers, but the appeal was taken only with respect to two of them. (*Walker, supra,* 77 Cal.App.4th at pp. 752, 754.) Despite plaintiffs' suggestion to the contrary, the fact that more than one insurer was a named defendant in the case does not imply that the causes of action were based on claims of concerted action. Indeed, nothing in the appellate opinion indicates that the number of defendant insurers had any effect on the court's analysis.

filed rate doctrine to approved insurance rates. (E.g., *Anzinger v. Illinois State Medical Inter-Ins. Exchange* (1986) 144 Ill.App.3d 719, 721, 723 [98 Ill.Dec. 533, 494 N.E.2d 655]; *Commonwealth v. Anthem Ins. Companies, Inc.* (Ky.Ct.App. 1999) 8 S.W.3d 48, 51–52; *City of New York v. Aetna Casualty & Surety Co.* (N.Y.App.Div. 1999) 264 A.D.2d 304 [693 N.Y.S.2d 139, 140].) Indeed, one such case noted that while the filed rate doctrine originated in federal courts, "it 'has been held to apply equally to rates filed with state agencies by every court to have considered the question.' " (*Commonwealth v. Anthem Ins. Companies, Inc., supra,* 8 S.W.3d at p. 52.) We thus must disagree with *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1418 [74 Cal.Rptr.3d 61], to the extent that it rejected the application of the filed rate doctrine to California insurance rates. The *Fogel* court noted that the parties before it had identified no cases in which the filed rate doctrine had been applied in the context of a rate approved by a state regulatory agency.[18] Thus, the filed rate doctrine supports our conclusion that there is no tort liability for charging a rate that has been approved by the commissioner.[19]

■ We note, however, the limited nature of our holding. Insurance Code section 1860.1 protects from prosecution under laws outside the Insurance Code only "act[s] done, action[s] taken [and] agreement[s] made pursuant to the authority conferred by" the ratemaking chapter. It does not extend to insurer conduct *not* taken pursuant to that authority.

Thus, cases which apparently reached a different result when the underlying conduct was *not* the charging of an approved rate are distinguishable on this basis. (See, e.g., *Donabedian v. Mercury Ins. Co., supra,* 116 Cal.App.4th at p. 992 [expressly acknowledging that the plaintiff "contends the Insurance Commissioner did not approve Mercury's use of the lack of prior insurance to determine, for example, eligibility for the Good Driver Discount or insurability"].) Indeed, if the underlying conduct challenged was not the

---

[18] That case also found it significant that "under California's system regulating insurance rates, insurers are allowed to rebate excess premiums to their policyholders." (*Fogel v. Farmers Group, Inc., supra,* 160 Cal.App.4th at p. 1418.) We do not see this as a bar to the application of the filed rate doctrine. Indeed, as a plan for rebating excess premiums to policyholders "shall not be deemed a rating plan or system" (Ins. Code, § 1860), the fact that an excess premium may be rebated does not in any way impact the controlling fact that, once a rating plan has been approved, the insurer may charge no other rate.

[19] Plaintiffs repeatedly argue that our conclusion grants insurers "immunity" for their illegal practices. Insurance Code section 1860.1 does not grant immunity; it simply limits plaintiffs to an administrative remedy (with judicial review). Plaintiffs' concern is not that insurers will be left free to charge illegal rates, but, rather, that they will be unable to collect damages or obtain disgorgement of any illegal premiums collected. There is no injustice in exempting an insurance company from disgorging premiums collected pursuant to a rate which has been approved in advance by the commissioner. (Cf. Ins. Code, § 1858.07 [providing no civil penalties may be imposed for the use of an approved rate].)

charging of an approved rate, but the *application* of an unapproved underwriting guideline, Insurance Code section 1860.1 would not be applicable. " 'It is possible for an insurance carrier to file with the [DOI] a rate filing and class plan that [satisfies] all of the ratemaking components of the regulations, and still result in a violation of the Insurance Code *as applied*. Such a [situation] would not involve a question of rates, but rather, it could easily involve the very separate, factual question of how the components of the class plan are applied toward members of the public.' " (116 Cal.App.4th at p. 993.) Similarly, cases which considered allegations of the improper collection of attorney-in-fact fees by a reciprocal insurance exchange (*Fogel v. Farmers Group, Inc., supra,* 160 Cal.App.4th at p. 1414) and the way an insurer analyzed data before reporting it to the Workers' Compensation Insurance Rating Bureau (*State Comp. Ins. Fund v. Superior Court, supra,* 24 Cal.4th at pp. 936–937) do not involve the charging of approved rates, and are therefore distinguishable.

Finally, we consider plaintiffs' argument based on *Farmers Ins. Exchange v. Superior Court, supra,* 2 Cal.4th 377. In that case, the Supreme Court considered a Business and Professions Code section 17200 action against multiple insurers, alleging that they violated the law by refusing to offer a "Good Driver Discount" to all eligible applicants, considering the absence of prior insurance as a criterion for considering eligibility for the Good Driver Discount, and unfairly discriminating in eligibility and rates for persons who qualify for the Good Driver Discount. (2 Cal.4th at pp. 381–382.) The Supreme Court concluded that, under the doctrine of primary jurisdiction, the action should be stayed pending pursuit of the administrative remedy before the commissioner. (*Id.* at p. 381.)

Although the case did not consider the application of Insurance Code section 1860.1, plaintiffs argue that the case, of necessity, included an approved rate. They therefore argue that the Supreme Court's conclusion that primary jurisdiction *stayed* the Business and Professions Code section 17200 action, without holding that the administrative remedy *completely precluded* it, necessarily includes the implicit holding that an approved rate can, in fact, be challenged in a Business and Professions Code section 17200 case. Plaintiffs argue that, "in this post Proposition 103 world, a carrier can not offer insurance to the public without <u>first</u> having its rates and class plan approved by the DOI. Therefore, in practice, a [p]laintiff would not even bring a [Business and Professions Code section 17200] action seeking restitution until <u>after</u> the illegal rating plan had been approved and implemented." The argument is without merit.[20] Plaintiffs' argument is based on the premise that an insurer that wishes to charge an illegal rate would submit

---

[20] Indeed, it undermines plaintiffs' argument that the "accident verification" factor was not approved by the DOI in this case.

the illegal rate as part of a rating plan and hope to obtain approval for it—where it is equally, if not more, likely that an insurer wishing to charge an illegal rate would submit a legal rating plan and then simply *not follow it*. Moreover, as discussed above, the fact that a rate plan may have been approved does not mean that the application of that rate plan, through unapproved underwriting guidelines, has also been approved. There is nothing in the opinion in *Farmers Ins. Exchange v. Superior Court, supra*, 2 Cal.4th 377 indicating that the challenged practices were part of an approved rate plan. Therefore, it has no bearing on our resolution of this appeal.

## DISPOSITION

The petition for writ of mandate filed by plaintiffs (No. B220469) is denied; the petition for writ of mandate filed by 21st Century (No. B223772) is granted and the trial court is directed to vacate its order denying 21st Century's motion for summary adjudication with respect to accident verification and to enter a new order granting the motion. As the two summary adjudication motions resolve plaintiffs' action in its entirety, the trial court is directed to enter judgment in favor of 21st Century. The parties shall bear their own costs in this proceeding.[21]

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied October 22, 2010, and on October 20, 2010, and October 22, 2010, the opinion was modified to read as printed above.

---

[21] This court has been advised by written communications from the parties, each dated September 29, 2010, that a tentative "settlement" of this class action has been negotiated. We have nonetheless determined to exercise our discretion to retain jurisdiction and file our decision in this matter. There are two reasons for doing so. First, as both parties have recognized, the negotiated settlement is only tentative and subject to further court proceedings as well as potential objections by class members. In addition, such settlement was negotiated after this matter had been submitted for decision. (*Cadence Design Systems, Inc. v. Avant! Corp.* (2002) 29 Cal.4th 215, 218, fn. 2 [127 Cal.Rptr.2d 169, 57 P.3d 865]; *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1014, fn. 3 [10 Cal.Rptr.3d 865].) Second, the issues presented by these consolidated writ petitions and addressed in this opinion are of major importance to both insurers and policy holders in California and are clearly of continuing public interest and are likely to recur. (See *People v. Eubanks* (1996) 14 Cal.4th 580, 584, fn. 2 [59 Cal.Rptr.2d 200, 927 P.2d 310].)