Filed 9/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOSEPH DAVIS et al.,<br>    Plaintiffs and Appellants,<br>    v.<br>CSAA INSURANCE EXCHANGE,<br>    Defendant and Respondent. | A169729<br><br>(Alameda County Super. Ct.<br>No. 22CV014132) |

Plaintiffs Joseph Davis and Shavonda Early brought this class action lawsuit against defendant CSAA Insurance Exchange (CSAA),[1] claiming that automobile insurance rates became excessive during the COVID-19 pandemic when there was less driving and fewer traffic accidents. They alleged that CSAA had a statutory obligation to refund premiums paid during that period, even though the premiums were collected under rates previously approved by the insurance commissioner. The trial court ruled that CSAA had no such obligation, and it sustained CSAA's demurrer without leave to amend. We affirm.

---

[1] CSAA is an automobile insurance company. Plaintiffs alleged that, in 2020 and 2021, CSAA was the fifth largest automobile insurance company in the state and insured over one million California drivers.

1

# I.
## BACKGROUND

After initially bringing separate class actions, plaintiffs alleged in a consolidated complaint that CSAA was required to refund paid automobile insurance premiums because rates the commissioner had previously approved became "excessive" during the COVID-19 pandemic. The complaint alleged two causes of action under California's Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.) (UCL) and a cause of action for unjust enrichment. The complaint alleged that, by not unilaterally refunding premiums, CSAA violated Insurance Code section 1861.05, subdivision (a) (section 1861.05(a)).[2] This section, titled "Approval of Insurance Rates," provides that "[n]o rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter."

CSAA filed a demurrer, which the trial court sustained with leave to amend. The court interpreted section 1861.05(a)'s language that no excessive rate shall "remain in effect" as applying to the insurance commissioner's system of approving rates, and meant to "ensure that a previously approved rate does not 'remain in effect' if the circumstances have changed." The court found that the statute allowed for prospective rate reductions when rates become excessive, but not retroactive modifications of previously approved rates.

In their first amended and consolidated complaint, plaintiffs reasserted the UCL claims, and reiterated that CSAA received an "unprecedented windfall" from the COVID-19 pandemic by continuing to charge preapproved rates as driving and traffic accidents decreased dramatically. At the same

---

[2] All further statutory references are to the Insurance Code unless otherwise noted.

time, plaintiffs acknowledged that some refunds were given. They recognized that, in April 2020, the insurance commissioner issued a bulletin directing insurers to "make an initial premium" refund for the prior two months. Although CSAA gave a 20 percent refund to policyholders, plaintiffs alleged that this amount was inadequate and the approved rates for this period remained excessive. Plaintiffs also recognized that the commissioner sent additional bulletins extending the directive for refunds. Although CSAA subsequently gave a 10 percent refund for May and June 2020, plaintiffs alleged that the rates were still excessive. According to plaintiffs, in 2021 the commissioner described the premium returns by California insurance companies as "insufficient."[3]

Plaintiffs asserted that CSAA's failure to provide sufficient refunds violated section 1861.05(a) and was unfair and unlawful. They sought restitution for the "unearned premiums acquired from [named plaintiffs] and the Class along with CSAA's investment returns on those unearned premiums."

CSAA again demurred, and this time the trial court sustained the demurrer without leave to amend. Referring to its prior ruling's interpretation of section 1861.05(a) and citing *State Farm General Insurance Company v. Lara* (2021) 71 Cal.App.5th 148, 160 (*Lara*), the court held that

---

[3] We grant plaintiffs' unopposed request for judicial notice of bulletins and letters issued by the insurance commissioner, as well as filings from CSAA's rate application. (Evid. Code, § 452, subd. (c); *Harris v. Alcohol Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589, 595 [granting judicial notice of insurance bulletins].) We deny plaintiffs' opposed request for judicial notice of documents, including rulemaking comments, CSAA internal rules and regulations, and materials related to other legislation and cases, as not presented to the trial court below and not necessary or helpful to our analysis. (Cal. Rules of Court, rule 8.252; *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

the "remain in effect" phrase "does not mean that a previously approved rate becomes unlawful if circumstances change." It determined that the statutory scheme permits insurance companies to charge rates that the insurance commissioner has approved, and it reasoned that the companies can no more be required to retroactively lower premiums based on preapproved rates than they can be required to retroactively increase them.

Judgment was entered in favor of CSAA, and this appeal followed.

## II.
## DISCUSSION

The central question in this appeal is whether section 1861.05(a) imposes an independent obligation on insurers to refund premiums that were collected under approved rates when those rates later become purportedly excessive. This presents a question of statutory interpretation, and to answer it we apply well-settled principles of statutory construction and exercise our independent judgment. (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933–934 (*Cannabis Coalition*).)

Section 1861.05(a) was enacted through the passage of Proposition 103 in 1988. (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 239–240 (*20th Century*).) As the statute was enacted by the people, our primary task is to give effect to the voters' intended purpose. (*Cannabis Coalition*, *supra*, 3 Cal.5th at p. 933.) To do so, we look first at the plain language of the provision, "which is typically the best and most reliable indicator of purpose." (*Ibid*.) "We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory . . . scheme." (*Ibid*.) "If the provision['s] intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials." (*Id*. at p. 934; see *Legislature v. Deukmejian* (1983) 34 Cal.3d

4

658, 673, fn. 14 ["Ballot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure"].)

### A.    *Proposition 103*

We begin with an overview of Proposition 103.  The proposition began with findings that "[e]normous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians" and "existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified[,] and arbitrary rates."  (Ballot Pamp., Gen. Elec. (Nov. 8, 1988) text of Prop. 103, § 1, p. 99.)  Its stated purpose was "to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians."  (*Ibid*.)  Proposition 103 was one of five competing insurance initiatives on the ballot, but the only one that passed.  (*Id.*, argument in favor of Prop. 103, p. 100; Sect. of State, certification of election results (Dec. 22, 1988).)

Proposition 103 "made numerous fundamental changes in the regulation of automobile and other forms of insurance in California."  (*20th Century*, *supra*, 8 Cal.4th at p. 240.)  Regarding the setting of insurance rates, the measure had two main components.  (*Lara*, *supra*, 71 Cal.App.5th at p. 160.)  The first imposed a " 'rollback period' " from November 1988 to November 1989, requiring insurers to reduce charges on automobile insurance policies " 'to levels which are at least 20% less than the charges for the same coverage which were in effect on November 8, 1987.' "  (*20th Century*, at pp. 242, 253; see also *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 813 (*Calfarm*); § 1861.01, subd. (a).)  This was a "temporary regulatory regime of rate reduction and freeze" that was "evidently designed

5

to allow the setting up of a permanent regulatory regime to follow." (*20th Century*, at p. 243.)

The second component of rate setting created a permanent "prior approval" system that required insurance rates to be approved by the insurance commissioner before they could be charged. (§ 1861.01, subd. (c) (section 1861.01(c)); *20th Century*, *supra*, 8 Cal.4th at p. 240.) Before Proposition 103, rates were regulated by "the so-called 'open competition' system." (*20th Century*, at p. 240.) Under this system, " 'California ha[d] less regulation of insurance than any other state,' " and " 'California automobile liability insurance [was] less regulated than most other forms of insurance.' " (*Ibid.*)

Proposition 103 added section 1861.05 as part of the prior-approval system. As we have said, the section is titled "Approval of Insurance Rates." Subdivision (a) states in full: "No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income." The remaining subdivisions of section 1861.05 specify various procedures related to such approval, including provisions requiring insurers to file rate applications with the commissioner when they want to change any rate. (§ 1861.05, subd. (b).)

Proposition 103 required automobile insurance rates to be determined by applying three factors—the insured's driving safety record, the annual number of miles driven, and the years of driving experience—and it allowed the insurance commissioner to adopt additional factors. (§ 1861.02,

6

subd. (a).)  It prohibited rates that were "unfairly discriminatory" and specified that the business of insurance was subject to California's unfair business practice laws.  (§§ 1861.05, subd. (a), 1861.03, subd. (a).)

Proposition 103 also designated the insurance commissioner to be an elected official, no longer appointed by the governor.  (§ 12900; *Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1372.)  Proponents of the measure argued that doing so would result in lower rates and increased scrutiny of consumer complaints regarding rates that were in effect.  (Ballot Pamp., Gen. Elec., *supra*, rebuttal to argument against Prop. 103, p. 101.)  Previously, although the Department of Insurance (CDI) had authority to investigate insurance rates after they took effect, the investigations were "limited" in both scope and frequency.  (*Id.*, analysis by legislative analyst, p. 98.)

Finally, Proposition 103 included provisions related to consumer participation.  It authorized consumers to ask the insurance commissioner to hold hearings on proposed rate changes.  (§ 1861.05, subd. (c)(1).)  Section 1861.10, subdivision (a), provided:  "Any person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article."

B.     *Interpretation of Section 1861.05(a)*

With this statutory overview in mind, we turn to the language of section 1861.05(a).  In arguing that the section imposes an independent obligation on insurers to issue refunds when approved rates become excessive, plaintiffs focus on the language in the first sentence that no "excessive" rate shall "remain in effect."  (§ 1861.05(a).)  We agree with plaintiffs that there is some ambiguity when viewing this language in

7

isolation, because the sentence uses the passive voice and does not specify an enforcement mechanism.  But when viewing this language in context, its meaning is clear.

To begin with, the section's title, "Approval of Insurance Rates," signifies that the provision is directed at the role of the commissioner.  And the second sentence in section 1861.05(a) establishes that considering whether a rate is excessive falls within that role.  It reads:  "In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and *the commissioner* shall consider whether the rate mathematically reflects the insurance company's investment income."  (§ 1861.05(a), italics added.)  As plaintiffs concede, approval of rates is solely within the commissioner's purview.  Nothing in section 1861.05(a)'s plain language or structure evinces an intent to impose an obligation on insurers to independently refund premiums that were paid under approved rates.

The ballot materials accompanying Proposition 103 support this view. They explained that the insurance commissioner would be required under the new "prior approval" system "to review and approve rate changes before they go into effect."  (Ballot Pamp., Gen. Elec., *supra*, analysis by legislative analyst, p. 98.)  Opponents of the measure then argued that the commissioner would have "enormous new powers" and, as an elected official, would become "preoccupied with raising campaign money from special interests all too willing to 'buy' influence."  (*Id.*, argument against Prop. 103, p. 101.)  Proponents did not dispute that Proposition 103 would broaden the commissioner's authority and responded:  "[N]o wonder the insurance companies don't want an elected Insurance Commissioner—in the states where people elect Insurance Commissioners, rates average 30% lower than

8

in California." (*Id.*, rebuttal to argument against Prop. 103, p. 101.) These materials confirm that the rate approval and review process implemented by Proposition 103, and as reflected in section 1861.05(a), was focused on the commissioner's expanded role and concomitant obligations.

Plaintiffs offer arguments for a contrary interpretation of section 1861.05(a) based on its language, other statutes added by Proposition 103, and the measure's overall purpose. We turn to examine these arguments, none of which are persuasive.

### 1. "Approved" and "remain in effect" language

Plaintiffs contend that the term "approved" and the phrase "remain in effect" in section 1861.05(a) are two distinct directives, and the latter phrase would be surplusage if the statute were interpreted to impose no obligation on insurers to unilaterally refund previously approved rates when circumstances render them excessive. But we view these directives as pertaining to the commissioner's approval of rates and review of rates, respectively.

As plaintiffs acknowledge, the insurance commissioner can not only approve new rates but also review rates already in effect. There are multiple mechanisms to initiate such review. For example, CDI promulgated a regulation expressly "[a]s a means to determine whether a rate previously approved remains in compliance with the statutory standard set forth in [section] 1861.05(a)." (Cal. Code Regs., tit. 10, § 2644.50.) Under this regulation, the commissioner can require insurers that have been charging premiums under approved rates for more than three years to file a rate application, triggering a new approval process. (*Ibid.*) Consumers can also trigger commissioner review of existing rates. Under section 1858, subdivision (a), any person "aggrieved" by a rate charged, a rating plan, or a

9

rating system can file a written complaint with the commissioner requesting such review. Section 1858.01, subdivision (a), then requires the commissioner to conduct a review, investigate the matter, and determine whether there is probable cause to believe a violation occurred. The commissioner's determination is subject to judicial review by petition for writ of administrative mandamus. (§§ 1858.6, 1861.09.)

Plaintiffs argue that these mechanisms are inadequate because they do not mandate review of all rates at all times and would allow insurers to maintain excessive rates "indefinitely" in violation of section 1861.05(a). But it is evident that the reforms in Proposition 103 were designed to allow the insurance commissioner and aggrieved persons to initiate review of potentially excessive rates when they consider it necessary and to obtain lower rates going forward when appropriate. These reforms guard against excessive rates being charged indefinitely.

### 2. Other statutes

Plaintiffs argue that our interpretation conflicts with other statutory provisions that Proposition 103 added. Section 1861.03, subdivision (a), states that insurance businesses are subject to California's unfair business practice laws, and section 1861.10, subdivision (a), provides that "[a]ny person may initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and enforce any provision of this article." While we agree that these provisions allow consumers and interested parties to enforce Proposition 103, they do not allow for the enforcement of an obligation that the measure never created.

10

### 3. Purpose of Proposition 103

Plaintiffs argue that declining to impose an obligation on insurers to independently refund premiums paid under approved rates cannot be harmonized with Proposition 103's purpose and its express directive that the measure be "liberally construed and applied in order to fully promote its underlying purposes." (Ballot Pamp., Gen. Elec., *supra*, text of Prop. 103, § 8, subd. (a), p. 144.) But plaintiffs offer no authority suggesting the liberal construction clause can be invoked to enlarge the meaning of section 1861.05(a). (Cf. *Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 23 [explaining that construction " 'should not exceed the limits of the statutory intent' "].) Moreover, the explicit purpose of Proposition 103 was "to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians." (Ballot Pamp., Gen. Elec., text of Prop. 103, § 1, p. 99.) Accordingly, its objective was "not just to keep insurance rates fair to consumers, but also to keep insurance *available*—which requires that rates be fair to the insurers as well." (*Lara*, *supra*, 71 Cal.App.5th at p. 176.) That dual purpose is reflected in section 1861.05(a), which states that no rate shall remain in effect that is "excessive" *or* "inadequate."

Moreover, the statutory interpretation plaintiffs advance presents a significant concern for which they have no satisfactory answer. As the trial court explained, there is nothing in section 1861.05(a) suggesting that any obligation by insurers under the statute would be one-sided and apply only to refunds. Instead, requiring insurers to retroactively refund premiums when preapproved rates become "excessive" would mean that insurers could demand retroactive higher premiums from policyholders if preapproved rates

11

were found "inadequate."  Plaintiffs argue that an asymmetrical obligation requiring refunds but denying increases is acceptable because insurers have more bargaining power and can apply for rate increases.  But this position has no basis in the language of section 1861.05(a), the overall statutory scheme, or the dual purpose of Proposition 103.

Nor do plaintiffs grapple with the practical consequences of their proposed "continuous" independent obligation for insurers to maintain rates that do not become "excessive."  They contend that CSAA's failure here was "not for a brief, incidental, or theoretical time, but over the prolonged period of reduced traffic and claims during the COVID-19 pandemic."  But again, nothing in section 1861.05(a) suggests any minimum time period necessary to establish insurers' non-compliance with their purported obligation.  This would seemingly allow challenges to rates that the commissioner approved but that became allegedly "excessive" even for the smallest amount of time, undermining the "prior approval" system Proposition 103 was intended to implement.

C.    *Decisional Law*

Our interpretation of section 1861.05(a) is also consistent with *Lara*, which the parties recognize as the primary published California authority on the issue.  In that case, State Farm applied to the insurance commissioner to increase its homeowners insurance rates but, upon consideration, the commissioner ordered State Farm to decrease its rate retroactively and issue refunds.  (*Lara, supra,* 71 Cal.App.5th at pp. 158–159.)  State Farm filed a petition for a writ of mandate, and the trial court issued a peremptory writ of mandate setting aside the order.  (*Id.* at p. 159.)  The appellate court agreed that the retroactive rate and refund were impermissible.  (*Ibid.*)

*Lara* reasoned that the "prior approval" system, including the insurance commissioner's role in approving and reviewing rates, operates prospectively. (*Lara*, *supra*, 71 Cal.App.5th at pp. 188–189.) The court pointed to section 1861.01(c), which "requires that rates be set before their use, and apply prospectively." (*Lara*, at p. 189.) And it rejected a different reading based on the "remain in effect" language of section 1861.05(a). (*Lara*, at p. 189.) *Lara* explained: "Construed in context, this language simply reflects that when a rate is reviewed and does not satisfy prior approval requirements (such as by being excessive), it will not go into effect or will no longer stay in effect. This is consistent with section [1861.01(c)]'s prospective orientation." (*Lara*, at pp. 189–190.)

Plaintiffs argue that *Lara* is either distinguishable or was wrongly decided and should be rejected here. Neither argument is persuasive.

1.    *Lara* is not distinguishable.

Plaintiffs emphasize that *Lara* was decided in a different factual context, as it concerned the insurance commissioner's authority in an administrative proceeding and not "what insurers and the courts can or cannot do" under Proposition 103. But we see nothing in *Lara*'s statutory interpretation of section 1861.05(a) or section 1861.01(c) that depends on or is unique to the decision's factual context.

Plaintiffs also suggest that *Lara*'s analysis does not apply because the relief they seek is not retroactive in nature. Specifically, plaintiffs maintain that their request for refunds would be "*prospective* action" done "in the interim" while applying for a lower rate, in order to "avoid *future* legal consequences." We reject this overly strained characterization. "In deciding whether the application of a law is prospective or retroactive, we look to function, not form." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 936–937.) We

13

ask whether the law " 'change[s] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct" and "substantially affect[s] existing rights and obligations." (*Id*. at p. 937.) Here, the first amended and consolidated complaint sought restitution for past premiums charged by CSAA and related investment returns it obtained. That relief would clearly affect CSAA's existing rights to those sums and impose new liability based on CSAA's past conduct.

2. *Lara* was correctly decided.

Plaintiffs alternatively argue that even if *Lara* is not distinguishable, it was wrongly decided and we should decline to follow it. They first argue that *Lara* misinterpreted section 1861.01(c), contending that the provision merely "*sets the date*" for the "prior approval" system to go into effect but does not "provide any substantive meaning as to *how* that system works." We disagree. The plain language of section 1861.01(c) articulates the fundamental feature of Proposition 103's "prior approval" system: that "insurance rates subject to this chapter must be approved by the commissioner prior to their use."

Plaintiffs also contend that *Lara*'s interpretation of section 1861.01(c) allows insurers a "safe harbor" to charge excessive rates in violation of section 1861.05(a). Again, we disagree. *Lara* rejected the availability of retroactive refunds for premiums based on approved rates because, under section 1861.01(c), insurers are entitled to charge approved rates. (*Lara*, *supra*, 71 Cal.App.5th at pp. 188–189.) While Proposition 103 does not provide for retroactive refunds, it does provide for the insurance commissioner's approval and review of rates, including those already in effect. This allows the commissioner to determine whether rates remain in

14

compliance with the section 1861.05(a) standard and, if not, to correct them going forward.

Second, plaintiffs repeatedly cite a single word from *Lara*: that State Farm was not only entitled but "required" to charge the approved rate under section 1861.01(c) until a different rate was approved. (*Lara, supra,* 71 Cal.App.5th at p. 194.) Plaintiffs contend that the cases cited by *Lara* to support this proposition—*Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750 *(Walker)* and *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427 *(MacKay)*—have since been "discredited."

In *Walker*, the trial court sustained a demurrer in a class action alleging insurers charged rates that were approved by the commissioner but nevertheless "excessive" within the meaning of section 1861.05(a). (*Walker, supra,* 77 Cal.App.4th at p. 753.) The appellate court affirmed, concluding that under section 1861.01(c) and other statutory provisions, "insurers must charge the approved rate and cannot be held civilly liable for so doing." (*Walker,* at p. 756.) And in *MacKay*, the plaintiff alleged that an insurer's rating practices violated section 1861.02, subdivision (a)'s permissible factors for determining rates and premiums. (*MacKay, supra,* 188 Cal.App.4th at p. 1432.) The appellate court was thus presented with the same question as we are: "[W]hether, after a rate has been approved, an insured may pursue a civil action to challenge what it believes to be an illegal rate." (*Id.* at pp. 1431–1432.) It concluded that "the statutory provisions for an administrative process (and judicial review thereof) are the exclusive means of challenging an approved rate." (*Id.* at p. 1432.)

Plaintiffs argue that *Walker* and *MacKay* "cannot survive" our state Supreme Court's analysis in *Villanueva v. Fidelity National Title Co.* (2021) 11 Cal.5th 104 (*Villanueva*), even though they recognize that *Villanueva* is

15

not a Proposition 103 case. The question in *Villanueva* was whether statutory *immunity* under section 12414.26—for acts done " 'pursuant to the authority conferred' " by rate-filing provisions—shielded title insurers from suit for charging *unauthorized* rates. (*Villanueva*, at pp. 110–111.) The Supreme Court concluded it did not. (*Ibid*.) Neither *Walker* nor *MacKay* involved assertions of section 12414.26 immunity or unapproved rates. (*Walker, supra*, 77 Cal.App.4th at p. 753; *MacKay, supra*, 188 Cal.App.4th at p. 1434.) The same is true here: CSAA has made clear, in its demurrer and on appeal, that it is not asserting statutory immunity, and plaintiffs concede that the insurance commissioner approved the rates at issue.[4]

Plaintiffs argue that even if *Walker*'s and *MacKay*'s reasoning has not been discredited, it was undermined by the insurance commissioner's 2020 bulletins and the "limited" refunds CSAA provided as a result. They question how CSAA could have lawfully provided those refunds if section 1861.01(c) *required* it to charge approved rates. As a preliminary matter, we note that the bulletins did not expressly state the authority under which their directives were issued, let alone contend that the refunds were consistent with section 1861.01(c) or required by any independent obligation of insurers under section 1861.05. More importantly, we have no occasion to opine on that authority, as plaintiffs correctly assert that the commissioner's power to direct refunds "is not at issue in this appeal."

Plaintiffs' third contention in arguing that *Lara* was wrongly decided is that the decision contradicts two other state Supreme Court cases—*Calfarm*

---

[4] CSAA has also made clear that its demurrer was not based on any assertion that the insurance commissioner has exclusive jurisdiction over rates. (See *Villanueva, supra*, 11 Cal.5th at pp. 126–133 [rejecting exclusive jurisdiction argument]; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 986–987 [same].)

and *20th Century*.  Not so.  As *Lara* correctly explained, these cases "were early and significant decisions regarding Proposition 103, and specifically the *rollback period*." (*Lara*, *supra*, 71 Cal.App.5th at p. 161, italics added.) *Calfarm* largely rejected a constitutional challenge to the rollback period, concluding that it did not deprive insurers of due process given the safeguards built into the regime.  (*Calfarm*, *supra*, 48 Cal.3d at pp. 814–815.) Then, *20th Century* rejected a challenge by insurers to the validity of rate regulations implementing the rollback period.  (*20th Century*, *supra*, 8 Cal.4th at p. 241.)

We agree with plaintiffs that *Calfarm* and *20th Century* generally described the dual obligations of section 1861.05(a) as the "approval" and "maintenance" of rates but, as discussed above, we interpret these as references to the insurance commissioner's approval and review of rates. (*Calfarm*, *supra*, 48 Cal.3d at p. 823; *20th Century*, *supra*, 8 Cal.4th at p. 245.)

*Calfarm* and *20th Century* also discussed refunds, but contrary to plaintiffs' suggestion otherwise, each did so in the context of the rollback period because refunds were expressly permitted during this limited time. (*Calfarm*, *supra*, 48 Cal.3d at p. 825 [describing rollback period where insurer could charge higher rates while application was pending, but could be required to refund excess premiums after commissioner review]; *20th Century*, *supra*, 8 Cal.4th at p. 246 [same].)  And *Calfarm* clarified that section 1861.05(a)'s standard applied to rates charged during the rollback period because the section "contains no language limiting its operation to rates after November of 1989." (*Calfarm*, at p. 823.)  This reasoning dispels any notion that the concept of refunds from the temporary rollback period

17

should be read into the permanent "prior approval" regime, as the provision implementing the rollback period was explicitly time-limited. (§ 1861.01.)

In sum, we conclude that section 1861.05(a) does not impose an independent obligation on insurers to retroactively refund premiums, based on rates that were approved by the insurance commissioner, when those rates later become purportedly excessive.[5]

### D. UCL "Unfair" Cause of Action

Even accepting our interpretation of section 1861.05(a) and its foreclosure of their claim that CSAA's conduct was unlawful, plaintiffs argue that the "inquiry is not over" because they also asserted a cause of action under the unfair prong of the UCL.

As explained in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 (*Cel-Tech*), in order to "guide courts and the business community adequately and to promote consumer protection, . . . any finding of unfairness to competitors under [Business and Professions Code] section 17200 [must] be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186–187; see also *Gregory v. Albertson's Inc.* (2002) 104 Cal.App.4th 845, 854 [noting that "where a claim of an unfair act or practice is predicated on public policy, we read *Cel–Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions"].) We agree with plaintiffs that their UCL unfair cause of action was explicitly "tethered" to the expressly stated purpose of Proposition 103, which enacted the statutory provisions at issue here, to "protect consumers from arbitrary insurance rates and practices" and "ensure

---

[5] In reaching this conclusion, we need not and do not address CSAA's additional arguments regarding how "insurance works" under sections 480 and 482, or how decreased driving might affect future rates.

18

that insurance is fair, available, and affordable for all Californians." (*Cel-Tech*, at p. 186; Ballot Pamp., Gen. Elec., *supra*, text of Prop. 103, § 2, p. 99.)

But *Cel-Tech* directed that its principles be applied in a two-step process, by determining (1) whether the Legislature (or presumably, voters enacting initiatives) provided a "safe harbor" that "affirmatively permits" the defendant's conduct; and if not, (2) whether the conduct is unfair. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 187.) Plaintiffs argue that here, the answer at the first step is "no," because nothing in Proposition 103 expressly permitted CSAA to maintain its previously approved rates when they became excessive during the COVID-19 pandemic. But we agree with *Lara* that the plain language of section 1861.01(c), requiring that rates "be approved by the commissioner prior to their use," affirmatively permitted CSAA to charge approved rates. (*Lara*, *supra*, 71 Cal.App.5th at p. 194.) We thus conclude that the trial court properly sustained CSAA's demurrer on both causes of action without leave to amend.[6]

### III.
#### DISPOSITION

The judgment is affirmed. CSAA is awarded its costs on appeal.

---

[6] Given this conclusion, we need not address CSAA's alternative argument that the restitution requested by plaintiffs is not an available remedy under the UCL.

                                            _____

                                            Humes, P.J.

WE CONCUR:

_____

Banke, J.

_____

Langhorne Wilson, J.

*Davis v. CSAA Insurance Exchange*  A169729

Trial Court:

Superior Court of the County of Alameda

Trial Judge:

Hon. Evelio M. Grillo

Counsel:

Consumer Watchdog, Harvey Rosenfield, Ryan Mellino; Nichols Kaster, PLLP, Robert L. Schug; Mehri & Skalat, PLLC, Michael Lieder; Manfred, APC, Manfred P. Muecke, for Plaintiffs and Appellants

Sheppard, Mullin, Richter & Hampton, LLP, Todd E. Lundel, Charles A. Danaher, Theona Zhordania, for Defendant and Respondent

*Davis v. CSAA Insurance Exchange* A169729